THE HONORABLE ELIZABETH HALVERSON, EIGHTH JUDICIAL DISTRICT COURT JUDGE, PETITIONER, *v.* THE HONORABLE KATHY A. HARDCASTLE, EIGHTH JUDICIAL DISTRICT COURT CHIEF JUDGE, RESPONDENT, AND THE STATE OF NEVADA, REAL PARTY IN INTEREST.

No. 49453

July 27, 2007

163 P.3d 428

*Gentile DePalma, Ltd.*, and *Dominic P. Gentile* and *William H. Gamage*, Las Vegas, for Petitioner.

*Catherine Cortez Masto*, Attorney General, and *Daniel Wong*, Chief Solicitor General, Carson City, for Respondent.

Before the Court EN BANC.[1]

## OPINION

By the Court, MAUPIN, C. J.:

This original petition for a writ of quo warranto raises important and novel issues regarding a chief district judge's authority over the actions of another district judge.

Due to reported events in the spring of 2007, the chief judge of the Eighth Judicial District in Clark County appointed a three-judge committee to work with a newly elected district judge in improving her judicial performance. Based on the three-judge committee's recommendation, the chief judge then reassigned the judge's criminal caseload to a different judge. Thereafter, citing security concerns that had arisen, in part, when the judge brought private bodyguards into the courthouse, the chief judge ordered the judge barred from the courthouse until she agreed to meet with the three-judge committee to address the security concerns.

The judge then filed the instant petition for a writ of quo warranto, challenging the chief judge's authority to carry out the above acts. The petitioning judge asserts that those acts constitute improperly imposed "punishment" for her judicial and nonjudicial conduct and that the effective removal from her courtroom compromised her ability to perform the duties of the constitutional office to which she was elected. On a broader level, her petition raises concerns regarding the scope of a chief district judge's authority over court security and other court administration matters

---

[1]THE HONORABLE MARK GIBBONS, Justice, and THE HONORABLE MICHAEL A. CHERRY, Justice, have voluntarily recused themselves from participation in this matter.

and the chief judge's power to personally address another elected judge's potentially discordant actions.

We conclude that, pursuant to properly adopted district court rules, a chief judge has broad administrative authority to ensure that the district court system functions as it should. Accordingly, the chief judge may, when appropriate under the rules, exercise that authority to appoint a three-judge committee to work with a judge and to reassign that judge's criminal caseload, even if those remedial actions impart an aspect of "punishment." A chief judge's authority, while broad, is not unlimited, however; it extends only so far as the express language of the rules or as is reasonably necessary in an emergency situation to ensure the district court system's proper functioning.

Consequently, the chief judge in this matter appropriately appointed a committee of judges to review the judge's judicial performance and reassigned the judge's caseload. In barring the judge from the courthouse when other less drastic measures could have been implemented, however, the chief judge intruded into the judge's judicial functions, warranting the issuance of a writ of quo warranto. Instead, unless faced with an emergency situation requiring immediate action, the chief judge's remedy is with the Nevada Commission on Judicial Discipline, which has authority over formally disciplining judges, or under certain circumstances, with this court, which has the ultimate administrative authority over the functioning of Nevada's court system.

In coming to this conclusion, we recognize that this is the first time that we have had the opportunity to examine these interrelationships in the context of the strong chief judge system, enacted by this court in the late 1990s. Accordingly, the parties to this matter and this court have, until the issuance of this opinion, been required to operate within the confines of an experiment in modern statewide and local judicial management. Thus, the judges involved in this interaction have had to act under their best judgment and discretion in attempting to comply with the constitutional, statutory, and court-imposed mandates discussed in this opinion.

## FACTS

In 2006, the people of Clark County, Nevada, elected petitioner Elizabeth Halverson to a district court judgeship. Upon assuming her judicial office in January 2007, the judge was assigned a blended docket of civil and criminal cases, conducted several trials, and attended training sessions at the National Judicial College. Less than three months later, however, a local newspaper purportedly reported concerns with Judge Halverson's performance on the bench. Judge Halverson asserts that, in the article, respondent Judge Kathy A. Hardcastle, chief judge of the Eighth Judicial Dis-

trict, commented on the reported concerns and, Judge Halverson insinuates, began an overly public attack on her judicial and non-judicial conduct, going far beyond the boundaries of a chief judge's authority.

During the next several weeks, in late March through early May 2007, the following events took place, which led to the instant quo warranto proceeding.

### A three-judge committee was formed

According to Chief Judge Hardcastle, in late March, she was informed that Judge Halverson had met with jurors in a criminal matter outside of counsel's presence and that, allegedly, Judge Halverson often abused and demeaned her staff, among other things. Upon learning of these potential concerns with Judge Halverson's behavior on and off the bench, Chief Judge Hardcastle requested the presiding criminal and family division judges, as well as another judge, to assist Judge Halverson with her transition to the bench, including helping her with issues that had arisen with respect to her criminal docket. The chief judge explains that she asked for the three judges' assistance in part because Judge Halverson held a "preexisting animosity" toward her personally.

In early April, the three-judge committee, along with the assistant court administrator and the human resources manager, met with Judge Halverson's staff. Later that same day, according to Judge Halverson, the committee "summoned" her to a meeting before it and the administrative employees, and the committee informed her that her bailiff had been reassigned. Then, she asserts, the three-judge committee proceeded to "berate" her, informing her that charges would be brought against her with the Nevada Commission on Judicial Discipline, that she would be removed from the bench, and that a senior judge would take over her functions and calendar. The committee maintains, however, that it merely informed Judge Halverson that the issues they had discussed were serious, and thus, these types of things "could" happen if the issues were not appropriately addressed.

In the committee's first of two reports, it indicated that Judge Halverson's staff had described her behavior as "paranoid" and inappropriate—revealing, among other things, that she claimed that everyone was watching her and out to get her, yelled at staff in a demeaning manner and called them names, fell asleep in court, often asked the court reporter to delete inappropriate comments that Judge Halverson had made while on the record, and treated her bailiff unsuitably, asking him to attend to certain personal needs. The report further expressed that, when the committee of judges explained to Judge Halverson the "specifics" of the alleged improper behaviors, Judge Halverson became "defensive"

and either denied, minimized, or disassociated herself from the alleged events.[2] Nevertheless, and notwithstanding Chief Judge Hardcastle's purported beneficial intentions, Judge Halverson viewed the committee's review of her and her staff as punitive.

Judge Halverson then retained counsel, who notified court administrator Charles Short that he had been retained as counsel for Judge Halverson, that her bailiff was removed unlawfully from her chambers, and that she would not attend any "such accusatorial meetings without counsel and an agenda." Short did not respond. The next day, Judge Halverson failed to attend a meeting with the three-judge committee, apparently because her attorney was not notified of the meeting and she was conducting a trial. Although the meeting was rescheduled for the following day, Judge Halverson did not attend.[3]

*Judge Halverson's criminal caseload is reassigned*

Based on her failure to attend or reschedule the meetings, the three-judge committee concluded that Judge Halverson was unwilling to receive its assistance and guidance. Accordingly, the committee submitted a separate final report to Chief Judge Hardcastle, recommending that, in light of the concerns regarding her judicial performance, Judge Halverson's current caseload be reassigned to one of the other incoming judges, each of whom had extensive experience in criminal law, and that she be reassigned a "civil-only" caseload. In that report, the committee also noted that, ostensibly, it could do nothing more to help Judge Halverson, as she appeared either unable or unwilling to cooperate, and it conveyed its beliefs that its members should have nothing more to do with any decision regarding her judicial department.

Chief Judge Hardcastle agreed that a temporary reassignment to an all-civil caseload was appropriate. Therefore, she informed Judge Halverson that, based on the three-judge committee's recommendation, her criminal caseload would be reassigned, effective April 30, 2007. Although Chief Judge Hardcastle asserts that Judge Halverson "was initially receptive" to the reassignment, both judges agree that at some point Judge Halverson protested, arguing that she saw the change as punitive, but Chief Judge Hardcastle nevertheless indicated that she would follow the committee's recommendation.

---

[2]Apparently, as the report was confidential, no copy of the report was forwarded to Judge Halverson.

[3]Instead of attending the three-judge committee meeting, Judge Halverson contacted the state bar to ask whether Rule of Professional Conduct 4.2—which prohibits a lawyer from communicating about the subject of the representation with a represented opposing party—applied to judges, and if so, who would enforce that rule. Judge Halverson contends that the state bar advised her that, for nonjudicial proceedings, it would enforce that rule.

*Judge Halverson is barred from the Clark County Regional Justice Center*

In early May, Judge Halverson transmitted a letter to court administrator Short, asking that her judicial executive assistant be discharged and not permitted back into chambers. At that time, Judge Halverson also personally hired two "bodyguards" to secure the office for her and her staff, assertedly because, although an administrative bailiff had been assigned to replace the removed bailiff during court sessions, she had no bailiff to provide security for chambers and while court was not in session. Apparently, neither court administration nor court security was informed in advance that Judge Halverson would be bringing the bodyguards into the Clark County Regional Justice Center for her personal protection, or that any such protection was needed.

The next day, after Chief Judge Hardcastle's bailiff attempted to serve Judge Halverson with a document concerning the terminated judicial executive assistant's retrieval of certain items from the judge's chambers, Judge Halverson's attorney transmitted a letter to Chief Judge Hardcastle "reminding her of her ethical obligation to contact Judge Halverson through her attorney regarding all issues relating to her 'position' as a district court judge." Later that day, Short, five bailiffs, a videographer, and the terminated judicial assistant entered Judge Halverson's chambers to conduct a search unauthorized by Judge Halverson. Judge Halverson's personal bodyguards, however, stopped the group before they entered Judge Halverson's inner office.[4]

According to Chief Judge Hardcastle, although one of the bodyguards earlier that morning had accompanied Judge Halverson through security, during which process court bailiffs found in his possession a retractable metal rod or collapsible baton, the second bodyguard appeared in Judge Halverson's chambers without having gone through security.

The following day, Chief Judge Hardcastle met with the three-judge committee and court administration to discuss the previous day's events. The chief judge asserts that they all agreed that the bodyguards should be removed from the courthouse and that the Las Vegas Metropolitan Police Department (LVMPD) should be informed and requested to be present when the removal occurred. Later that morning, after receiving Chief Judge Hardcastle's request, LVMPD officers questioned Judge Halverson about the security situation. According to Judge Halverson, the police left without incident; at that time, the bodyguards were not removed from the building. Chief Judge Hardcastle contends, however, that according to the police, Judge Halverson insisted that she had the

---

[4]These events occurred under the direction of Acting Chief Judge Elizabeth Gonzalez. During this time, Judge Halverson contacted emergency services by calling 9-1-1 to report that an ex-employee was present without authorization.

right to retain private bodyguards and refused to have them leave the courthouse. The chief judge also asserts that the police informed her that Judge Halverson had indicated to them that everyone, including the police, was against her and could not be trusted.

Although Judge Halverson admits that she was asked to meet with a committee of judges later that day, she refused to do so because she was not contacted through her attorney.[5] Then, according to Chief Judge Hardcastle, the presiding judges and court administration agreed that Judge Halverson and her bodyguards should be removed from the building until Judge Halverson agreed to meet with the chief and presiding judges to discuss everyone's security concerns. Given that Judge Halverson had previously, in her words, "barricaded" herself inside her chambers, they agreed to wait until she had left the building to implement their decision to temporarily exclude her from the justice center.

### Chief Judge Hardcastle, on May 10, 2007, orders Judge Halverson barred from the Regional Justice Center

On May 10, 2007, Chief Judge Hardcastle entered an administrative order prohibiting Judge Halverson and her two private bodyguards from entering the Regional Justice Center. Judge Halverson alleges that she was not given notice or an opportunity to be heard before being banned from the building. The order stated that Judge Halverson's decision to hire her own bodyguards contravened justice center security protocols and posed a "potential danger to the judges, the public, and the [justice center's] occupants." According to the order, Judge Halverson also "committed various other actions which have placed an unwarranted strain on the limited resources of the court and have unduly interfered with courthouse business."

Specifically, the order pointed to Judge Halverson's "repeated expressions of distress, her repeated claims that 'everyone is against her,' and her repeated claims that she cannot trust anyone in Court Administration," as leading "the Court to believe that disruptive behavior and threats to courthouse security will continue." Accordingly, Chief Judge Hardcastle ordered that, "in order to protect public safety and to prevent further interference with the orderly administration of justice in the courthouse," Judge Halverson, effective immediately, was barred from the justice center until she agreed to meet with the three-judge committee "to discuss these issues and to provide assurances that her disruptive behavior and threats to the courthouse security will no longer continue." Finally, indicating that hiring protocols must be followed, the order provided that Judge Halverson's two private bodyguards,

---

[5]According to Chief Judge Hardcastle, Judge Halverson's attorney was copied on the invitation.

and "any other private bodyguards who are attempting to provide protection to Judge Halverson in the [justice center,] [would] be required to leave the building or they [would] be immediately arrested."

This petition for a writ of quo warranto followed, in which Judge Halverson specifically challenges Chief Judge Hardcastle's authority to do three things: (1) require her to meet with the three-judge committee concerning her judicial and nonjudicial activities; (2) remove and reassign her criminal caseload; and (3) order that she be barred from the justice center until she agrees both to meet with the committee of judges and to discontinue her "disruptive behavior and threats to courthouse security." As directed, Chief Judge Hardcastle has timely filed an answer. In her answer, the chief judge asserts that she possesses and properly exercised authority as chief judge to carry out each of the challenged actions, and consequently, she argues, a writ of quo warranto is not warranted.[6]

## DISCUSSION

This court has original jurisdiction over quo warranto proceedings.[7] Under NRS 35.010(1), quo warranto is appropriate to remedy an act by which a person "usurps, intrudes into, or unlawfully holds or exercises, a public office."[8] Generally, a proceeding in quo

---

[6]Chief Judge Hardcastle's answer also challenges Judge Halverson's standing to seek a writ of quo warranto. She argues that, based on NRS 35.030, NRS 35.040, and the circumstances presented here, the Attorney General is the only public officer authorized to petition for quo warranto relief because, although NRS 35.050 allows an individual other than the Attorney General to seek quo warranto relief in situations where the individual is claiming to be entitled to a public office that is unlawfully being held and exercised by another, that is not the situation presented here.

We conclude, however, that Judge Halverson has standing to seek the writ. *See, e.g., Harvey v. Dist. Ct.*, 117 Nev. 754, 759-60, 32 P.3d 1263, 1267 (2001) (recognizing that a public officer may, upon his own relation, bring a quo warranto action); *State v. Malone*, 68 Nev. 32, 34-35, 226 P.2d 277, 278 (1951) (recognizing that Nevada's former statutes governing actions in quo warranto provided for, with certain conditions, "an action in the name of a person who himself claims to be entitled to the office against another person unlawfully holding the same"); *State ex rel. Stenberg v. Murphy*, 527 N.W.2d 185, 191 (Neb. 1995) (providing that, under a Nebraska statute, quo warranto "is intended to prevent the exercise of powers that are not conferred by law").

[7]Nev. Const. art. 6, § 4.

[8]Although NRS Chapter 35 speaks to "civil actions" in the nature of quo warranto, NRS 35.010(1), the Nevada Constitution vests in this court "power to issue *writs* of . . . *quo warranto*," Nev. Const. art. 6, § 4 (first emphasis added). The Nevada Constitution does not place any limitations on this court's authority to issue such writs and does not give the Legislature authority to

warranto may not be maintained when other adequate legal or equitable remedies are available.[9]

Here, Judge Halverson asserts that a writ of quo warranto is available and warranted to address Chief Judge Hardcastle's usurpation of, or intrusion into, Judge Halverson's office and the constitutional position held by the Nevada Commission on Judicial Discipline, and that she has no other adequate means by which to attain relief. To a limited extent, we agree.

Essentially, this petition raises important issues regarding whether, and the extent to which, a chief judge may exercise his or her administrative authority over court business in a manner that impacts or limits another district judge's ability to independently exercise his or her constitutional powers and obligations to perform judicial functions. While, as Judge Halverson concedes, a chief judge is authorized to administratively coordinate "the smooth running of court business," as she also points out, all elected judges enjoy coextensive and concurrent jurisdiction and power, and the Nevada Commission on Judicial Discipline enjoys exclusive authority over formal judicial discipline. Thus, if the chief judge's administrative powers include evaluating a fellow judge's conduct and rendering punishment against that judge based on perceptions about the propriety of that conduct, those powers could interfere with the powers of other judicial officers and the Nevada Commission on Judicial Discipline, issues that have not previously been addressed by this court.

As discussed below, while Judge Halverson correctly asserts that the chief judge's authority does not extend to acts the governance of which is constitutionally conferred on other bodies, such as judicial discipline, she underestimates the scope of the chief judge's powers. In Nevada, a chief judge is broadly authorized to carry out the district courts' inherent authority to ensure the orderly administration of judicial business. Consequently, so long as

---

change the nature of quo warranto proceedings. Accordingly, while NRS Chapter 35 creates an alternative remedy, it does not impact this court's original power to consider writ petitions seeking quo warranto relief. *See Secretary of State v. Nevada State Legislature*, 120 Nev. 456, 465, 93 P.3d 746, 752 (2004) (noting that the Legislature cannot by statute limit this court's constitutional power to issue writs of quo warranto); *Galloway v. Truesdell*, 83 Nev. 13, 26, 422 P.2d 237, 246 (1967) (pointing out that, under the separation of powers doctrine, the Legislature is without power to change a constitutional power or function); *State v. Baker and Josephs*, 35 Nev. 300, 307, 129 P. 452, 453 (1912) (noting that this court allowed a writ of quo warranto proceeding to go forward).

[9]*See People ex rel. Hansen v. Phelan*, 634 N.E.2d 739, 743 (Ill. 1994); *Plaquemines Parish Council v. Petrovich*, 629 So. 2d 1322, 1326 (La. Ct. App. 1993); *Murphy*, 527 N.W.2d at 190; *State ex rel. Johnson v. Talikka*, 642 N.E.2d 353, 354 (Ohio 1994); *McElhaney v. Anderson*, 598 N.W.2d 203, 206 (S.D. 1999).

the chief judge follows relevant statutes and court rules, he or she may convene committees of judges to review another judge's conduct in processing cases and even remove or reassign cases. Further, under certain circumstances, she may properly exercise her supervisory authority over court business to ban another judge from the courthouse. Her supervisory authority over other judges' exercise of judicial functions, however, is limited to emergency circumstances that were not demonstrated here; accordingly, as Judge Halverson has no other adequate means by which to raise this issue, her petition is granted in part.

Because this matter raises novel issues with respect to the constitutionality of the statutes and rules broadly authorizing a chief judge to supervise administrative court business, and the scope of that authority, we take this opportunity to explore the Nevada judiciary's general administrative powers under the state constitution, express and implied, from which a chief judge's authority is derived. Then, the specific powers relative to chief judges are described and, finally, applied to the allegations in this petition.

## The Nevada judiciary's general administrative power

In Nevada, the judiciary's administrative power is both express and implied. Express powers are set forth in the Nevada Constitution, statutes, and rules adopted by this court. Inherent powers are derived from two sources: the separation of powers doctrine and the judiciary's sheer existence by virtue of the judicial functions expressly created under Nevada's Constitution.[10]

### Express judicial powers

Since 1977, the Nevada Constitution, Article 6, Section 19(1), has expressly recognized "[t]he chief justice [as] the administrative head of the court system." As the administrative head, the Constitution instructs, the chief justice has authority, in accordance with rules adopted by this court, to apportion supreme court work among the justices, assign district judges to assist other district courts or to any specialized functions established by law, and recall retired justices or judges to active service.[11] Additional descriptions of the judiciary's powers are set forth in statutes and court rules, several of which are discussed later in this opinion.

By expressly identifying the chief justice as the court system's administrative leader, Article 6, Section 19(1) imbues the chief jus-

[10]*Blackjack Bonding v. Las Vegas Mun. Ct.*, 116 Nev. 1213, 1218, 14 P.3d 1275, 1279 (2000); *see also State v. Sargent*, 122 Nev. 210, 216, 128 P.3d 1052, 1056 (2006).

[11]Nev. Const. art. 6, § 19(1).

tice with superintending authority over other judges' exercise of their inherent administrative powers. As this court has previously recognized, "designating the chief justice as the 'administrative head of the court system' . . . clearly implies inherent power to take actions reasonably necessary to administer justice efficiently, fairly, and economically."[12] Accordingly, this court, through the chief justice, has the ultimate authority over the judiciary's inherent administrative functions.[13]

### *Inherent power under the separation of powers doctrine*

Under the Nevada Constitution's "separation of powers" clause, "[t]he powers of the Government of the State of Nevada" are divided into three separate departments—legislative, executive, and judicial.[14] Essentially, the legislative power, which is vested in the state Legislature,[15] refers to the broad authority to enact, amend, and repeal laws; the executive power, vested in the Governor,[16] encompasses the responsibility to carry out and enforce those laws (*i.e.*, to administrate); and, under Article 6, the judicial power is vested in the state court system, comprised of the supreme court, district courts, and justices of the peace,[17] carrying with it "the capability or potential capacity to exercise a judicial function . . . to hear and determine justiciable controversies."[18]

These governmental powers are coequal,[19] and no person charged with the exercise of one department's powers may exercise "any functions" of the other departments, except when "expressly

---

[12]*In re Petition to Recall Dunleavy*, 104 Nev. 784, 786, 769 P.2d 1271, 1272 (1988) (quoting Nev. Const. art. 6, § 19(1)).

[13]The chief justice's authority is subject to rules adopted by this court, Nev. Const. art. 6, § 19(1), and under the Supreme Court Rules, each supreme court justice's vote is of equal weight in directing the administration of this court and the use of this court's resources, *see* SCR 7(1). *See also* SCR 7(4) (providing that, when acting as administrative head, the chief justice must follow any decision or order entered by a majority of the court); SCR 7(9) (providing that any administrative order entered by the chief justice is subject to modification or revision by the majority).

[14]Nev. Const. art. 3, § 1(1).

[15]*Id.* art. 4, § 1.

[16]*Id.* art. 5, § 1.

[17]*Id.* art. 6, § 1. Although statutorily created, municipal courts are also part of Nevada's judicial system. *See Blackjack Bonding*, 116 Nev. at 1219, 14 P.3d at 1280.

[18]*Galloway v. Truesdell*, 83 Nev. 13, 20, 422 P.2d 237, 242 (1967) (emphasis omitted).

[19]*Blackjack Bonding*, 116 Nev. at 1218, 14 P.3d at 1279; *Goldberg v. District Court*, 93 Nev. 614, 615, 572 P.2d 521, 522 (1977).

directed or permitted'' under the Constitution.[20] Accordingly, to ensure that each power remains independent from influences by other branches of government, each department possesses inherent power to ''administer its own affairs'' and ''perform its duties,'' so as not to ''become a subordinate branch of government.''[21]

### Inherent power by virtue of the judiciary's sheer existence

To ensure that the executive, legislative, and judicial powers are meaningful, the governmental department in which each respective power is vested also has—by virtue of its mere constitutional existence—inherent authority ''to accomplish or put into effect,'' *i.e.*, to carry out, the department's basic functions.[22] The power derived from the departments' ''sheer existence is broader and more fundamental than the inherent power conferred by separation of powers,''[23] and it exists even when one department, in carrying out its functions, exercises roles more commonly seen in the scope of another department's powers.[24]

As has long been recognized, these sources provide the judiciary with inherent authority to administrate its own procedures and to manage its own affairs, meaning that the judiciary may make rules and carry out other incidental powers when '''*reasonable and necessary*''' for the administration of justice.[25] For instance, a court has inherent power to protect the dignity and decency of its proceedings and to enforce its decrees, and thus it may issue contempt orders and sanction or dismiss an action for litigation abuses.[26] Further, courts have inherent power to prevent injustice

---

[20]Nev. Const. art. 3, § 1(1).

[21]*Blackjack Bonding*, 116 Nev. at 1218, 14 P.3d at 1279.

[22]*Galloway*, 83 Nev. at 21, 422 P.2d at 243; *see also Blackjack Bonding*, 116 Nev. at 1218, 14 P.3d at 1279; *id*. at 1219, 14 P.3d at 1279 (''[W]hen a constitution or statute gives a general power, it also grants by implication every particular power necessary for the exercise of that power.'').

[23]*Blackjack Bonding*, 116 Nev. at 1218, 14 P.3d at 1279.

[24]*Galloway*, 83 Nev. at 21-22, 422 P.2d at 243 (explaining that one department's action, even when it overlaps or duplicates another department's functions, is valid to the extent that it is derived from, and can be traced back to, the original department's basic source of power).

[25]*Borger v. Dist. Ct.*, 120 Nev. 1021, 1029, 102 P.3d 600, 606 (2004) (emphasis added) (quoting *Goldberg*, 93 Nev. at 615, 572 P.2d at 522); *see also State v. Dist. Ct.*, 116 Nev. 953, 959, 11 P.3d 1209, 1212-13 (2000) (recognizing that courts have inherent power to govern their own procedures and to make any and all necessary or desirable procedural rules).

[26]*Matter of Water Rights of Humboldt River*, 118 Nev. 901, 906, 59 P.3d 1226, 1229 (2002); *Young v. Johnny Ribeiro Building*, 106 Nev. 88, 92, 787 P.2d 777, 779 (1990) (cautioning litigants and attorneys that district courts have

and to preserve the integrity of the judicial process,[27] which power generally has been recognized as encompassing the authority, placed in the highest court in the system, to discipline judges.[28] Finally, as at least three other jurisdictions have recognized, courts have inherent authority to make certain that their courtrooms are secure.[29] By necessity, this latter exercise of inherent power extends to ensuring courthouse security in general.[30]

inherent equitable powers to dismiss an action for litigation abuses); *see also Maldonado v. Ford Motor Co.*, 719 N.W.2d 809, 818 (Mich. 2006) (noting that the court's authority to impose sanctions " 'is rooted in a court's fundamental interest in protecting its own integrity and that of the judicial process' " (quoting *Cummings v. Wayne County*, 533 N.W.2d 13, 14 (Mich. Ct. App. 1995))).

[27]*Kabase v. District Court*, 96 Nev. 471, 472, 611 P.2d 194, 195 (1980); *In re Credit Acceptance Corp.*, 733 N.W.2d 65, 70 (Mich. Ct. App. 2007) (recognizing that a court may exercise its inherent power to protect its fundamental interest in its own integrity and that of the judicial process (citing *Maldonado*, 719 N.W.2d at 818)); *see also Jordan v. State, Dep't of Motor Vehicles*, 121 Nev. 44, 59, 59 n.23, 110 P.3d 30, 41, 42 n.23 (2005) (recognizing that Nevada courts "possess inherent powers of equity and of control over the exercise of their jurisdiction" and citing *De Long v. Hennessey*, 912 F.2d 1144 (9th Cir. 1990) (recognizing that federal courts have inherent power to regulate abusive litigation); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991) (discussing the " 'control necessarily vested in courts' " to "police" themselves and administer the judicial process in an orderly and effective manner (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1960)))); *Bd. of Com'rs, Weld Co. v. 19th Jud. Dist.*, 895 P.2d 545, 547-48 (Colo. 1995) (noting that a court's inherent powers consist of those " 'reasonably required' " to efficiently perform judicial functions, protect its dignity, independence, and integrity, and to make effective its lawful actions (quoting *Pena v. District Court of Second Jud. Dist.*, 681 P.2d 953, 956 (Colo. 1984))).

[28]*See, e.g., Judicial Qualifications Com'n v. Lowenstein*, 314 S.E.2d 107, 108 (Ga. 1984) (noting that courts have inherent authority to supervise, generally, the legal practice, and thus the Georgia Supreme Court had authority to promulgate and enforce its code of judicial conduct); *In re DeSaulnier*, 274 N.E.2d 454, 456 (Mass. 1971) (pointing out that the Massachusetts Supreme Judicial Court's inherent and constitutional authority, as highest court in the state, "to protect and preserve the integrity of the judicial system and to supervise the administration of justice," provided it with authority over judicial conduct); *In re Judicial Conduct Committee*, 855 A.2d 535, 537-38 (N.H. 2004) (recognizing that the New Hampshire Supreme Court's authority over judicial conduct stems, in part, from its inherent power to regulate court officers and to maintain public confidence and integrity in the judicial system).

[29]*Epps v. Com.*, 626 S.E.2d 912, 918 (Va. Ct. App. 2006); *Bd. of Com'rs, Weld Co.*, 895 P.2d at 548-49; *State v. Wadsworth*, 991 P.2d 80, 89-90 (Wash. 2000) (recognizing that a court has "the inherent power and obligation . . . to control all its necessary functions to promote the effective administration of justice," and thus, the court may act as "reasonably necessary for the efficient administration of justice" and "to ensure the safety of court personnel, litigants and the public").

[30]*Epps*, 626 S.E.2d at 918, 920 (recognizing that courts' inherent authority to ensure the security of their courtrooms and to ensure the orderly administration of justice "necessarily extends to ensuring the security of the court house," since "it would be folly to claim the circuit court judge has the power

### The limits of inherent judicial power

Inherent judicial power is not infinite, however, and it must be exercised within the confines of valid existing law.[31] Generally, a court's inherent authority is limited to acts that are reasonably necessary for the judiciary's proper operation.[32] Thus, inherent power should be exercised only when established methods fail or in an emergency situation.[33] Moreover, that inherent power ceases when the court's ability to carry out its constitutional duty to ensure the administration of justice no longer is in jeopardy.[34] Finally, because inherent power arises from the constitution's operation, constitutional clauses may remove or modify that power.[35] One example is Article 6, Section 21 of the Nevada Constitution, which creates the Nevada Commission on Judicial Discipline and thereby largely removes from this court the inherent authority to discipline judges, placing it instead with the commission.[36]

### The Nevada Commission on Judicial Discipline's authority

Under the Nevada Constitution, the judicial discipline commission exercises exclusive original jurisdiction over the formal discipline of judges, which may include censure, removal, and retirement.[37] The Constitution further provides that the Legislature may

---

to ensure courtroom, but not courthouse, security" and "[i]f the judge is impotent to supervise who enters the courthouse, the ability to ensure the security of the courtroom is diminished").

[31]*Credit Acceptance*, 733 N.W.2d at 70 (citing 20 Am. Jur. 2d *Courts* § 39, at 430 (2005) (citing *Veilleux v. State*, 635 So. 2d 977 (Fla. 1994))).

[32]*Bd. of Com'rs, Weld Co.*, 895 P.2d at 548.

[33]*Matter of Salary of Juvenile Director*, 552 P.2d 163, 173 (Wash. 1976) (citing *State v. Sullivan*, 137 P. 392 (Mont. 1913); *Leahey v. Farrell*, 66 A.2d 577 (Pa. 1949)); *accord Co. Commissioners v. Devine*, 72 Nev. 57, 60, 294 P.2d 366, 367 (1956).

[34]*Bd. of Com'rs, Weld Co.*, 895 P.2d at 549.

[35]*See generally* 16 C.J.S. *Constitutional Law* § 305, at 497 (2005) ("The judiciary department in the United States is subservient only to the federal constitution, to the established law of the land, and, if a state judiciary, to the state constitution." (citing *White v. State*, 47 So. 2d 863 (Fla. 1950); *Petition of Florida State Bar Ass'n*, 40 So. 2d 902 (Fla. 1949); *People v. Spegal*, 125 N.E.2d 468 (Ill. 1955); *People v. Scher*, 349 N.Y.S.2d 902 (Sup. Ct. 1973)); *see supra* note 31 for authority explaining that inherent power must be exercised in accordance with valid laws.

[36]The Constitution's restriction on this court's traditional inherent authority does not affect this court's express power to review the judicial discipline process through appeals or original writ proceedings.

[37]Nev. Const. art. 6, § 21(5); *see Goldman v. Bryan (Goldman II)*, 106 Nev. 30, 37, 787 P.2d 372, 377 (1990) (noting that when a constitutional provision expressly requires something to be effected in a particular manner, that man-

enact statutes providing the commission with authority to impose other forms of judicial discipline.[38] As part of its disciplinary powers, the judicial discipline commission may discipline district judges for failing to follow administrative procedures[39] or for abusing their inherent power.[40] The Constitution also provides the judicial discipline commission with discretion to "suspend a justice or judge from the exercise of his office pending the determination of the proceedings before the commission."[41]

These constitutional provisions, however, do not remove or modify the courts' inherent power to take emergency administrative ac-

---

ner is exclusive, as if the constitution had expressly forbid the use of a different manner (citing *Robison v. District Court*, 73 Nev. 169, 175, 313 P.2d 436, 440 (1957)) and pointing out that, accordingly, the judicial discipline commission's constitutional authority was "preeminen[t]," despite the existence of statutory authority on the same subject); *Goldman v. Nevada Comm'n on Judicial Discipline (Goldman III)*, 108 Nev. 251, 275, 830 P.2d 107, 122 (1992) (recognizing that the commission is the " 'proper entity exclusively empowered to act in the first instance' " (quoting *Goldman II*, 106 Nev. at 41, 787 P.2d at 379)), *overruled on other grounds by Matter of Fine*, 116 Nev. 1001, 1022 n.17, 13 P.3d 400, 414 n.17 (2000); *see also* NRS 1.440(1) ("The Commission has exclusive jurisdiction over the censure, removal, involuntary retirement and other discipline of judges which is coextensive with its jurisdiction over justices of the Supreme Court and must be exercised in the same manner and under the same rules."). *But see* Nev. Const. art. 2, § 9; *id.* art. 7, § 2; NRS 3.092 (providing for the voluntary retirement of district court judges for permanent physical or mental incapacitation from performing the duties of office, regardless of age).

[38]Nev. Const. art. 6, § 21(5).

[39]*See* NRS 1.4653(1), (2), (4)(b) (providing that the commission may discipline a judge for willful misconduct, including knowingly committing an administrative act that tends to impair the administration of justice in a judicial proceeding, willful or persistent failure to perform the duties of office, habitual intemperance, or knowing or deliberate violation of the Nevada Code of Judicial Conduct); NCJC Canon 2A (requiring a judge to respect and comply with the law and act in a manner that promotes public confidence); NCJC Canon 3B(8) (requiring a judge to dispose of all judicial matters promptly, efficiently, and fairly); NCJC Canon 3C (governing a judge's administrative responsibilities, including requiring the judge to cooperate with other judges and court officials in the administration of court business); *see also Matter of Castellano*, 889 P.2d 175, 180-81 (N.M. 1995) (concluding that removal through a judicial review board proceeding was an appropriate sanction for judge who, among other things, harassed the court administrator, interfered with the court administrator's duties, and refused to follow the chief judge's administrative directives).

[40]*See Goldman III*, 108 Nev. 251, 830 P.2d 107.

[41]Nev. Const. art. 6, § 21(9); *see also* NRS 1.4675(3) (providing that the commission, in accordance with its procedural rules, may suspend a justice or judge from exercising his office with salary pending the final determination of a complaint, if "the justice or judge poses a substantial threat of serious harm to the public or to the administration of justice").

tion in situations that do not impinge upon the commission's disciplinary authority. As the courts' inherent power over judicial conduct issues is removed only to the extent that it is expressly overridden by constitutional and statutory provisions that pertain to the judicial discipline commission, that power remains with respect to issues not allocated to the commission.

Although NRS 1.4675(3) allows the commission to temporarily suspend a justice or judge until pending disciplinary proceedings are finally resolved, this statute does not preempt inherent judicial authority in certain emergency situations. Because the commission's ability to act with regard to temporary suspensions is limited to matters referred to it and then may only be exercised upon seven days' notice,[42] the courts may act under their inherent authority to temporarily suspend a justice or judge in exigent circumstances that arise before the commission may take action. This authority, however, may only be exercised to address the immediacy of any particular situation, and in doing so, the acting court must contemporaneously refer the matter to the commission for possible action. Any nonexigent issue implicating the formal discipline of a justice or judge falls outside the authority of the courts to act and, thus, must be lodged directly with the commission.

In recognizing this court's inherent powers in *Goldman v. Bryan (Goldman I)*, a 1988 decision, we suggested, in dictum, that this court could take action that might have been within the exclusive jurisdiction of the judicial discipline commission.[43] In particular, we opined that Article 6, Section 19(1) of the Nevada Constitution allowed the chief justice, in the interest of appropriately administrating justice and with the other justices' unanimous consent, to enter an administrative order temporarily prohibiting a district judge from exercising his judicial functions over criminal and civil cases.[44] In retrospect, however, *Goldman I* presents two problems.

First, although this court suggested that because its administrative order did not affect the judge's salary or other "emoluments of his office," it therefore did not "suspend" or "remove" the judge from his elected office,[45] temporary suspension, at least, was the true effect of the order. Second, the administrative order in *Goldman I* may have impinged upon the commission's authority to impose discipline and to temporarily suspend the judge, since this

---

[42]CJD Rule 9(2).

[43]104 Nev. 644, 647, 764 P.2d 1296, 1297-98 (1988).

[44]*Id.*; *see also id.* at 647 n.3, 764 P.2d at 1298 n.3 (stating that the chief justice "with the concurrence of the other justices clearly was entitled to order [this temporary prohibition] under the circumstances, pursuant to their constitutionally granted authority to administer the court system").

[45]*Id.* at 647 n.3, 764 P.2d at 1298 n.3.

court did not determine in that case that it was handling an emergency that the commission could not address. Accordingly, while the judge in *Goldman I* did not challenge this court's administrative order, and that portion of the opinion concerning the order is therefore dictum, we disavow the *Goldman I* dictum in light of the principles set forth in this opinion.

As we properly recognized in *Goldman I*, however, this court's powers do not extend to removing a judge from office. Under the Nevada Constitution, a judge can be removed from office only by the voters,[46] by the Legislature,[47] or, as of 1976, by the Nevada Commission on Judicial Discipline.[48] Nonetheless, other than a judge's censure, removal, retirement or other statutorily created discipline, this court retains supervisory authority and duties over the proper administration of justice.

*Chief judges' authority*

NRS 3.025(1) designates the position of chief judge in counties, such as Clark County, populated by at least 100,000 people.[49] Under NRS 3.025(2), chief judges are responsible for several administrative duties—namely, assigning cases to each district judge, prescribing court hours, and, as noted above, adopting any rules or regulations that are necessary for the proper conduct of business.[50] Further, a chief judge is to perform all other statutory chief judge or presiding judge duties.[51] Legislation further provides that the chief judge is responsible for ensuring that district court case consideration and disposition procedures are uniformly applied and that cases are timely considered and decided, and for establishing procedures for addressing a party's grievance regarding case administration (but not the merits of a case).[52]

Although, under the separation of powers doctrine, the Legislature generally cannot bestow or inflict upon the judiciary nonjudi-

---

[46]Nev. Const. art. 2, § 9 (providing that voters may recall elected officials from office).

[47]*Id.* art. 7, § 2 (providing that the Legislature may impeach judicial officers); *id.* § 3 (providing that the Legislature may remove judges and justices "[f]or any reasonable cause").

[48]*Id.* art. 6, § 21(1).

[49]We take judicial notice that Clark County's population is more than 100,000 people. NRS 47.130.

[50]NRS 3.025(2)(a)-(c).

[51]NRS 3.025(2)(d).

[52]NRS 3.026(1)(a); NRS 3.026(1)(b), (2).

cial powers,[53] we have previously recognized that even so, the Legislature may grant judges administrative and ministerial powers and functions, if those powers and functions are reasonably necessary to accomplishing judicial duties.[54] In other words, the Legislature may statutorily " 'sanction' " the courts' exercise of inherent powers, with which statutes the courts may acquiesce.[55] Because these types of statutes merely endorse courts' independent rights, however, they are valid only to the extent that they do not attempt to restrict or abolish the courts' inherent powers.[56]

Relevant to this matter, we previously recognized two statutes as codifying the judiciary's inherent rulemaking powers: NRS 2.120(1), which provides, in pertinent part, that "[t]he Supreme Court may make rules not inconsistent with the Constitution and laws of the State for its own government, the government of the district courts, and the government of the State Bar of Nevada," and NRS 3.025(2)(c), which provides, in pertinent part, that "[t]he Chief Judge [of the district court] shall . . . [a]dopt such other rules or regulations as are necessary for the orderly conduct of court business."[57]

As noted above, the latter statute, subsection 1, also specifies the position of chief judge. In this, the Legislature appears to have "sanctioned" the judiciary's exercise of its inherent powers. As, facially, this statute does not attempt to limit or destroy the court's inherent power, it is valid. Moreover, we have "acquiesced" in this legislative pronouncement: SCR 16(1) provides that districts that elect a chief judge under NRS 3.025 must do so in accordance with the local rules and that this court must then ratify the selection before the chief judge assumes the position.

### Limits on chief judges' administrative authority and duties

Under SCR 16(3), the judiciary has delegated its inherent "authority to make administrative decisions pertaining to the business of the . . . judicial district" to that district's chief judge, who may

---

[53]*Galloway v. Truesdell*, 83 Nev. 13, 23, 422 P.2d 237, 244 (1967).

[54]*Id.* at 24, 422 P.2d at 245.

[55]*Goldberg v. District Court*, 93 Nev. 614, 616, 572 P.2d 521, 522 (1977) (quoting *Lindauer v. Allen*, 85 Nev. 430, 434, 456 P.2d 851, 854 (1969)).

[56]*Id.* at 616-17, 572 P.2d at 522 (quoting *Lindauer*, 85 Nev. at 434, 456 P.2d at 854); *see also Blackjack Bonding v. Las Vegas Mun. Ct.*, 116 Nev. 1213, 1220 n.4, 14 P.3d 1275, 1280 n.4 (2000) ("When the Legislature, by statute, authorizes the exercise of an inherent judicial power, the courts may acquiesce out of comity or courtesy; however, such statutes are merely legislative authorizations of independent rights already belonging to the judiciary. A statute that attempts to limit or destroy an inherent judicial power is unconstitutional." (citations omitted)).

[57]*Goldberg*, 93 Nev. at 616 n.4, 572 P.2d at 522 n.4.

act to the extent that a statute or court rule so authorizes, subject to the chief justice's supervision.[58] Nevertheless, SCR 16(3) recognizes that, as administrative head of the court system, the chief justice has final say over district court administrative matters, and thus this court, through its chief justice, may override a chief judge's administrative decision. With emphasis added, SCR 16(3) provides as follows:

> **Chief judge of certain judicial districts.**
>
> . . . .
>
> 3. **Administrative decisions of chief judge.** The chief judge, as authorized by statute or court rule, has the authority to make administrative decisions pertaining to the business of the judge's respective judicial district. *Pursuant to Nev. Const. art. 6, § 19, as the administrative head of the Nevada court system, the chief justice may overrule any such administrative decision if the chief justice determines the decision does not comport with the proper administration of the court system.*

This exercise of rulemaking authority is both necessary and proper. Since the various district judges hold "equal coextensive and concurrent jurisdiction and power,"[59] they generally share the same inherent powers, and thus, without a rule specifically directing how administrative power is to be exercised amongst district judges, one judge has just as much inherent authority to regulate the district court system as any other elected judge.

But even though it is critical that judges have total and absolute independence in resolving cases and at all stages in making judicial decisions, as the United States Supreme Court has pointed out with respect to Article III federal courts, it is something else altogether to suggest that each and every judge in a complex system controls all aspects of how the judicial business is performed.[60] Thus, as the Court suggested, each judge cannot be "an absolute monarch" over the administration of the court if a complex judicial system is to function properly and efficiently.[61] Instead, court administration rules—and centralized power to implement them—are "reason-

---

[58]*See also Zimmerman v. State*, 79 P.3d 910, 912 (Or. Ct. App. 2003) (indicating that a lower court's exercise of its inherent authority was reviewable by the state supreme court for an abuse of discretion).

[59]NRS 3.220; *Rohlfing v. District Court*, 106 Nev. 902, 906, 803 P.2d 659, 662 (1990) (recognizing that, under the Nevada Constitution and NRS 3.220, district judges lack jurisdiction to review acts of other district judges); *see generally* Nev. Const. art. 6, § 5.

[60]*Chandler v. Judicial Council*, 398 U.S. 74, 84 (1970).

[61]*Id.* at 84-85.

able, proper, and necessary'' to the accomplishment of judicial functions.[62]

The statutes and rules creating a chief judge system to govern district courts' administration serve just this purpose.[63] Accordingly, as the rules, which demonstrate acquiescence in the pertinent statutes and delineate a chief judge's administrative duties, are reasonable and necessary, they constitute a valid exercise of this court's rulemaking power.

Under the Eighth Judicial District Court Rules (EDCR), which were approved by this court, the chief judge has broad supervisory powers over ''the court administrator in the management of the court,'' ''the administrative business of the court,'' and the court's ''attach[é]s,''[64] as well as generally over various court officers and all administrative court personnel not permanently assigned to a particular judge.[65] The chief judge is responsible for, among other things, making regular and special assignments of all judges and ensuring that matters are covered when the judge to which they are assigned is absent or otherwise unavailable,[66] assuring the quality and continuity of services necessary to the court's operation,[67] supervising the court's calendar and apportioning the court's business among the court's departments as equally as possible,[68] reassigning cases between departments as convenience or necessity requires,[69] and assuring that court duties are timely and orderly performed.[70] The chief judge's duties, as prescribed in the EDCR, ''shall be done in accordance with applicable Nevada Revised Statutes, Supreme Court Rules and established court policies.''[71]

Even while conferring this extensive authority on the chief judge, the EDCR recognizes and maintains, in some respects, the

---

[62]*Id.* at 85.

[63]*See In re Petition to Recall Dunleavy*, 104 Nev. 784, 786, 769 P.2d 1271, 1272 (1988) (recognizing that ''Article 6, § 19(1)(b) of the Nevada Constitution, which by designating the chief justice as the 'administrative head of the court system' and empowering the chief justice to '[a]ssign district judges to assist in other judicial districts,' clearly implies inherent power to take actions reasonably necessary to administer justice efficiently, fairly, and economically'').

[64]EDCR 1.30(b)(7). ''Attaché'' is defined as a person ''connected with an office, *e.g.*, a public office.'' *Black's Law Dictionary* 125 (6th ed. 1990).

[65]EDCR 1.30(b)(7), (12).

[66]EDCR 1.30(b)(5). Unless otherwise provided in the district court rules, ''all cases must be distributed on a random basis.'' EDCR 1.60(a).

[67]EDCR 1.30(b)(8).

[68]EDCR 1.30(b)(14).

[69]EDCR 1.30(b)(15).

[70]EDCR 1.30(b)(18).

[71]EDCR 1.30(b)(18)(iv).

other district judges' concurrent powers. For instance, the chief judge is not to act alone on all matters but must instead engage standing or special committees of judges "as may be advisable to assist in the proper performance of the duties and functions of the court."[72] The chief judge must also convene "frequent and regular meetings of the judges" or their elected representatives, and special meetings may be held "as may be required by the business of the court."[73] If a quorum of judges does not attend, the chief judge can mandate their attendance at the next meeting.[74]

By a two-thirds vote, the "judges present at a duly noticed meeting" may remove the chief judge from his or her position.[75] Additionally, "[a]ny judge may appeal any order of the chief judge to the full panel of the district judges in the district," and any chief judge order may be reversed by at least "a two-thirds vote of the judges attending a regularly scheduled meeting."[76] An "executive committee," comprised of the chief judge and presiding criminal, civil, and family division judges, must meet once a month to address administrative items and must provide a report and minutes of these meetings to the judges at their quarterly meetings.[77] Thus, while creating a strong chief judge system with centralized administrative authority in the chief judge, the rules nonetheless recognize district judges' inherent powers and encourage the judges to work together to maintain the efficient, fair, and economical administration of justice.[78]

Further, because all judges possess inherent power, for example, "of equity and of control over the exercise of their jurisdiction,"[79] the chief judge's authority over administrative matters must be bal-

---

[72]EDCR 1.30(b)(16).

[73]EDCR 1.30(b)(18)(i).

[74]*Id.*

[75]EDCR 1.30(b)(18)(iii).

[76]*Id.*; *see also* SCR 16(3) (providing that the chief justice may overrule any chief judge's administrative decision). Since this petition seeks relief in addition to that related to the chief judge's May 10 order, it is a proper means by which to address the legal issues presented by that order, even though Judge Halverson apparently has not attempted to appeal the order to the full panel of district judges.

[77]EDCR 1.30(b)(20).

[78]*See Dunleavy*, 104 Nev. at 786, 769 P.2d at 1272 (noting the judiciary's inherent power to ensure that justice is administered properly); *see also* NCJC Canon 3C(1) (providing that a judge "should cooperate with other judges and court officials in the administration of court business").

[79]*Jordan v. State, Dep't of Motor Vehicles*, 121 Nev. 44, 59 & n.23, 110 P.3d 30, 41, 42 n.23 (2005).

anced with other judges' rights to independently carry out their judicial functions. Accordingly, while a judge's position as chief implies authority to use his or her inherent power on behalf of the other judges in the district, that power must be exercised as any other inherent power—with caution, when no other means are adequate or an emergency arises, and as reasonably necessary for the proper functioning of the judiciary.[80]

*Chief Judge Hardcastle's exercise of authority in this matter*

 *The three-judge committee*

As previously mentioned, under EDCR 1.30(b)(16), to accomplish his or her administrative obligations, the chief judge "must" "[a]ppoint standing and special committees of judges as may be advisable to assist in the proper performance of [the court's] duties and functions."[81] Chief Judge Hardcastle argues that this rule allowed her to form the three-judge committee, so that the committee could attempt to address issues relating to Judge Halverson's conduct on and off the bench. We agree.

As noted above, Chief Judge Hardcastle explains that when she was informed of complaints by other judges, attorneys, and court staff concerning Judge Halverson's behavior, she invoked this rule to form a committee to review these issues and to help resolve them. The matters reviewed by the committee, as described in its reports, fall within EDCR 1.30(b)(16)'s purview over "assist[ing] in the proper performance of [the court's] duties and functions." That rule's committee provisions are broad, and as the rules encourage judges to work together in administering the Eighth Judicial District Court system, forming the committee to "assist in the proper performance of [the judge's] duties and functions" is authorized, even if the committee's formation and recommendations carry with them a perceived element of "punishment." The creation of the committees is proper so long as the committee does not intrude into the judge's authority to independently rule on cases or the Nevada Commission on Judicial Discipline's authority to formally discipline judges.

Judge Halverson does not allege here that her judicial independence has been threatened, and the mere formation of a committee to review a judge's conduct—even when that committee talks with the judge and the judge's staff and recommends that the

---

[80]*See supra* p. 263.

[81]Although caseflow apparently is not at issue here, a committee may also be formed to monitor each department's caseflow in order to identify backlogs requiring attention and "to review compliance with court delay reduction standards." EDCR 1.90(c)(1).

judge take certain steps—does not amount to the type of formal discipline or censure that is within the judicial discipline commission's exclusive authority.[82]

While it is unclear whether, as chief, Judge Hardcastle has the responsibility to act on complaints made by staff permanently assigned to another judge, at least to the extent that the actions alleged by the staff members have not unreasonably disturbed court operations,[83] here, the staff members were willing to discuss problems that they were having in carrying out court functions. Thus, the committee properly met with them. Accordingly, with respect to the committee's formation and actions, our issuance of a writ of quo warranto is not warranted to "oust" the chief judge from any improper exercise of authority.

The EDCR, however, do not provide that the chief judge can require another judge to meet with a committee.[84] And although the parties dispute whether Chief Judge Hardcastle ever "ordered" Judge Halverson to meet with the committee, her May 10 order conditioned Judge Halverson's return to the justice center on Judge Halverson agreeing "to meet with the [committee]." But since the

---

[82]*See, e.g.*, NRS 1.4677 (listing examples of permissible nonremoval and noncensure types of discipline that the commission may impose, including requiring the judge to pay fines, serve a term of suspension from office, complete a probationary period, attend training or educational courses, follow "a remedial course of action," issue a public apology, comply with conditions or limitations on future conduct, seek professional help, and agree not to seek judicial office in the future); *Black's Law Dictionary* 237 (8th ed. 2004) (defining "censure" as "[a]n official reprimand or condemnation; harsh criticism"); *Merriam-Webster's Collegiate Dictionary* 185 (10th ed. 1997) (defining "censure" as "a judgment involving condemnation" and "an official reprimand").

[83]EDCR 1.30(b)(7) directs the chief judge to supervise the court administrator and, generally, the court's "attach[é]s," but the judge's authority over administrative court personnel extends only to those persons "not permanently assigned to a particular district court judge," EDCR 1.30(b)(12). Here, it appears that some of the staff who participated in the April meeting, including the judicial executive assistant and the court reporter (NRS 3.320), might have been permanently assigned to Judge Halverson. While, as Chief Judge Hardcastle points out, it seems obvious that someone who has filed a discrimination complaint should be removed from the complained-against person's control, it is unclear from the documents submitted by the parties who was authorized to address these departmental personnel issues, and what policies apply to appropriately deal with such issues.

[84]*Cf.* EDCR 1.90(c)(3) (providing that a caseflow review committee may recommend that a judge be "required" to attend proceedings with a judge whose docket is current or an educational program on docket management). As noted, *supra* note 81, Judge Halverson's caseflow does not appear to be at issue here.

chief judge has no authority to require a judge to meet with a committee to discuss her performance, as further addressed in the "removal" section below, the chief judge likewise has no authority under the rules to ban from the courthouse a judge who refuses to do so. The proper remedy, absent an emergency situation, would be either with this court, as "administrative head of the court system,"[85] or, if appropriate, with the judicial discipline commission.

### Reassignment of criminal cases

SCR 16(3), through EDCR 1.30(b)(5), requires the chief judge to assign cases to each judge, in accordance with the other local rules.[86] Under the EDCR, the chief judge may "[r]eassign cases from a department to another department as convenience or necessity requires."[87] EDCR 1.60(a) reiterates that the chief judge has authority to assign and reassign all pending cases but also indicates that, "[u]nless otherwise provided in these rules, all cases must be distributed on a random basis." With respect to the types of cases assigned to each department, the chief judge must assign judges to blended and specialized divisions, which includes a civil-only division, on a rotating two-year basis, "as needed."[88]

The specialization of divisions within a district is a constitutional exercise of the Nevada judiciary's inherent (and express) authority to govern its affairs. Under the Constitution, district courts have original jurisdiction "in all cases" not within the justice court's original jurisdiction.[89] Thus, while district courts have original jurisdiction in both criminal and civil matters,[90] the Constitution does not require that this jurisdiction be simultaneously exercised by each district judge. Indeed, the Constitution expressly provides that the Legislature may establish a family court division in certain districts.[91] And because the Constitution further grants this court authority to assign district judges to specialized functions established by law,[92] we may, by rule, properly provide for other specialized divisions within the districts, so long as the rule does not purport to permanently eliminate a judge's authority to hear both criminal and civil cases.

---

[85]Nev. Const. art. 6, § 19(1).

[86]*See* EDCR 1.30(b)(18)(iv); *see also* NRS 3.025(1)(a).

[87]EDCR 1.30(b)(15).

[88]EDCR 1.33.

[89]Nev. Const. art. 6, § 6(1).

[90]*See id.* §§ 6, 8; NRS 4.370.

[91]Nev. Const. art. 6, § 6(2).

[92]*Id.* § 19(1)(b).

Consistent with this authority and our rulemaking authority,[93] we approved and adopted EDCR 1.33, which provides for specialization of district court judges for two-year rotating terms, as needed. Accordingly, as long as the chief judge had valid ''convenience'' or ''necessity'' reasons for the reassignment of Judge Halverson's caseload, that action was proper.

Although Judge Halverson argues that the reassignment was punitive, and while Chief Judge Hardcastle does not entirely disagree with this assertion, there was, at the least, a ''convenience'' reason (and possibly a ''necessity'' reason) for reassigning her cases. As acknowledged by both judges, Judge Halverson has had more experience in the civil law arena, and allowing her more time to become proficient on criminal procedure could help the court to operate more efficiently.[94] Further, the transfer could assist the court, as a whole, in the orderly performance of its duties.[95]

Thus, as the chief judge has pointed to valid reasons of convenience or necessity for reassigning Judge Halverson's criminal cases to another judge, and as Judge Halverson does not suggest that the chief judge failed to comply with EDCR 1.33's rotation requirement or that any of the cases reassigned to Judge Halverson were not randomly assigned, quo warranto will not lie to prevent Chief Judge Hardcastle from exercising her authority to reassign cases.

*Effective removal from office*

Finally, Judge Halverson argues that Chief Judge Hardcastle's May 10 order banning her from the Regional Justice Center effec-

---

[93]NRS 3.020 also supports this proposition:

> In judicial districts where more than one judge has been provided for, the judges have concurrent and coextensive jurisdiction within the district, under such rules as may be prescribed by law, and the district judges therein may make additional rules, not inconsistent with law, which will enable them to transact judicial business in a convenient and lawful manner.

Thus, to the extent that Judge Halverson argues that the removal of her criminal cases interfered with the ''equal coextensive and concurrent jurisdiction and power'' (NRS 3.220) that she shares with other judges, that argument is unavailing.

[94]We note that Judge Halverson has asserted that she ''always remain[s] willing to help with the court's caseload management [only] if it is truly for the benefit of the district.'' But as explained above, determining what is best for the district court system is within the chief judge's discretion as administrative head of the district court, subject to review by a majority of the other district judges and this court, not by a lone judge affected by the chief judge's discretionary decision.

[95]EDCR 1.30(b)(18).

tively removed her from her office, as it rendered her unable to pursue her judicial decision-making functions. In response, Chief Judge Hardcastle asserts that she properly exercised her express and inherent power to maintain courthouse security. In this, she relies upon her statutory authority to adopt rules and regulations necessary to the orderly conduct of court business,[96] and she points to her EDCR 1.30(b)(18) authority to ensure the timely and orderly performance of court duties.[97] Chief Judge Hardcastle's reliance upon these prerogatives is problematic, as explained below.

### Express authority

As an initial matter, while there can be no dispute that courthouse security is essential to the proper and orderly conduct of court business, the chief judge has not proffered or identified any rules or regulations regarding courthouse security implicated in this instance. Additionally, while her duty to ensure timely and orderly performance of court duties arguably gave the chief judge authority over the removal of Judge Halverson's unauthorized private bodyguards, at least to the extent that they interfered with the orderly performance of court duties,[98] it does not pertain to banning Judge Halverson, a member of the district court, from the courthouse.[99] In the absence of properly adopted security rules or other explicitly stated authority permitting the chief judge to ban other judges from the courthouse, no express authority for such action has been shown. We therefore consider the chief judge's inherent authority to take this action.

---

[96]NRS 3.025(2)(c).

[97]Chief Judge Hardcastle also points to the statute providing that she has the duty to ensure that "[t]he procedures which govern the consideration and disposition of cases and other proceedings within the jurisdiction of the district court are applied as uniformly as practicable," NRS 3.026(1)(a)(1), but she omits the "consideration and disposition of cases and other" language in using this statute to support her argument that she is required to ensure that courthouse security procedures were uniformly applied. NRS 3.026(1)(a)(1) applies to the uniformity of procedures with respect to "consideration and disposition" of legal proceedings, not security.

[98]Again, EDCR 1.30(b)(7) provides that the chief judge has supervisory authority over court "attach[é]s." We note that Judge Halverson explains that she hired the two private bodyguards to provide security services for her office and staff, which are clearly related to the court's "administrative business" as a whole, over which the chief judge has supervisory authority. *Cf.* EDCR 1.30(b)(12) (explaining that the chief judge has general supervisory control over all "administrative court personnel" who are not permanently assigned to a particular judge).

[99]*See, e.g., Rohlfing*, 106 Nev. at 906, 803 P.2d at 662 ("The district courts of this state have equal and coextensive jurisdiction; therefore, the various district courts lack jurisdiction to review the acts of other district courts."); *Fulton County*, 149 S.E.2d at 147-48 (explaining that, while Georgia's Superior

### Inherent authority

Since the district judges enjoy equal power,[100] the chief judge may not exercise his or her inherent authority to bar other district judges from performing their judicial duties, except in emergency situations in which no other adequate means exist to preserve court security or other reasonably necessary court functions.[101] These emergency situations may arise in the same type of circumstances contemplated by NRS 1.4675(3), which provides certain criteria for a judge's temporary suspension—that the "judge poses a substantial threat of serious harm to the public or to the administration of justice." An "emergency" is created when protective steps need to be taken before the commission may act. Accordingly, as Chief Judge Hardcastle has not demonstrated, through this record or her findings, that any such emergency authorized the use of her inherent powers to immediately ban Judge Halverson from the justice center in order to protect the proper administration of justice, or that she had no other adequate means by which to do so, we conclude that she exceeded her powers as the chief judge, effectively intruding upon Judge Halverson's exercise of judicial functions.

### Other considerations

In part, the May 10 order appears to be an attempt to force Judge Halverson to communicate with the chief judge and/or other judges concerning her security concerns. In this, the chief judge seemingly relied upon EDCR 1.30(b)(5), which allows her to make special assignments of judges. Apparently, Chief Judge Hardcastle maintains that requiring Judge Halverson to discuss the se-

---

Court Chief Judge Rules constitutionally empowered the chief judge to reassign and distribute cases among the other judges, the constitution would not allow any rule that would permit the chief judge to strip another superior court judge of the jurisdiction and power conferred upon him or her by the constitution); *cf.* NCJC Canon 3C(3) (providing that a judge with supervisory authority for the judicial performance of other judges must take "reasonable measures to assure the prompt disposition of matters before them and the proper performance of their other judicial responsibilities").

[100]NRS 3.220; NRS 3.020.

[101]Nev. Const. art. 6, § 19(1); *see, e.g.*, *People ex rel. Sullivan v. Swihart*, 897 P.2d 822, 823-24 (Colo. 1995) (concluding, without expressing any opinion with respect to inherent authority, that a chief district judge, who was the "administrative head" of the Colorado district courts, had authority, based on this status, to issue and enforce an order prohibiting law enforcement officers who were acting within their duties from carrying deadly weapons into the courthouse, as the order was necessary "for the proper administration of justice"); *see also In re Franciscus*, 369 A.2d 1190 (Pa. 1977) (indicating that,

curity concerns was a "special assignment." But while cooperation between judges is important to the court's effective operation and encouraged under Nevada's Code of Judicial Conduct,[102] no district court rule provides the chief judge with authority to force such cooperation.[103] Instead, as noted above, the proper enforcement of that requirement is with the judicial discipline commission. Alternatively, the chief judge may request other, nondisciplinary, administrative action from this court. Ultimately, however, the chief judge or this court, through its chief justice, must seek, from the judicial discipline commission, any disciplinary remedies for a judge's failure to comply with administrative procedures and mandates.

 ██

Because, under the circumstances presented in this case, Chief Judge Hardcastle possessed neither express nor inherent authority to ban Judge Halverson from the Regional Justice Center, a writ of quo warranto is appropriate in this instance to "oust" Chief Judge Hardcastle from intruding into Judge Halverson's exercise of her constitutional office.

---

although Pennsylvania's constitution prescribed the means by which judges may be removed from office or subjected to disciplinary proceedings, it did not revoke or diminish the supreme court's inherent authority to exercise its supervisory or administrative powers to temporarily suspend a lower court judge when exigent circumstances justify the suspension); *Adams v. Rubinow*, 251 A.2d 49, 60-62 (Conn. 1968) (indicating that a "temporary suspension, for the protection of the public, pending the outcome of . . . an impeachment proceeding," would be constitutionally permissible).

[102]*See* NCJC Canon 3C (governing a judge's administrative responsibilities, including cooperating with other judges and court officials in the administration of court business).

[103]Judge Halverson indicates that she properly refused to meet with the three-judge committee and with Chief Judge Hardcastle and that she properly refused to accept or respond to correspondence from the court administrator about her personal security guards because, under RPC 4.2, Judge Hardcastle and court personnel were "ethical[ly] obligat[ed] to contact Judge Halverson through her attorney" with regard to any issues related to her "position" as district court judge.

Judge Halverson's reliance on RPC 4.2, however, is misplaced. Under that rule, a lawyer, in representing a client, is prohibited from "communicat[ing] about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Under the circumstances presented here, Chief Judge Hardcastle, the committee judges, and court administrator Short, were not acting as lawyers representing a client, and therefore, RPC 4.2 does not prohibit them from directly contacting the represented party (Judge Halverson) about the subject of the representation (her " 'position' as district court judge"). Moreover, it is questionable whether Judge Halverson's perceived performance issues constituted a "matter" at the time when Judge Halverson was refusing to communicate with her colleagues.

## CONCLUSION

Judge Halverson not only challenges Chief Judge Hardcastle's authority to take the actions discussed in this opinion, she also complains that the motives behind those acts were punitive. Chief Judge Hardcastle's motives, however, need not be examined as long as she acts in accordance with the rules and within the scope of her inherent authority and does not improperly interfere with Judge Halverson's duties to independently exercise her judicial decision-making functions, the Nevada Commission on Judicial Discipline's authority over disciplinary matters, or this court's authority, through its chief justice, as administrative head of the court system.

Because Chief Judge Hardcastle's actions in appointing a three-judge committee and in removing Judge Halverson's criminal cases constituted a proper exercise of her administrative authority, a writ of quo warranto is not warranted to address those issues. With respect to the May 10 order banning Judge Halverson from the justice center until she cooperates, however, Chief Judge Hardcastle overstepped her authority. Accordingly, we grant the petition, in part, and we direct the clerk of this court to issue a writ of quo warranto "ousting" Chief Judge Hardcastle from intruding upon Judge Halverson's exercise of her judicial functions in this manner.[104]

HARDESTY, PARRAGUIRRE, DOUGLAS and SAITTA, JJ., concur.

---

[104]In light of this opinion, we vacate our May 17, 2007, temporary stay and deny Judge Halverson's emergency stay motion as moot.