ROBERT YBARRA, JR., Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 52167

March 3, 2011                                    247 P.3d 269

[Rehearing denied June 29, 2011]

*Franny A. Forsman*, Federal Public Defender, and *Michael Pescetta*, Assistant Federal Public Defender, Las Vegas, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *Richard W. Sears*, District Attorney, White Pine County, for Respondent.

Before the Court EN BANC.

## OPINION

By the Court, PARRAGUIRRE, J.:

A jury sentenced appellant Robert Ybarra, Jr., to death in 1981 for the murder of 16-year-old Nancy Griffith. Two decades later, the United States Supreme Court held in *Atkins v. Virginia*, 536 U.S. 304 (2002), that the Eighth Amendment's ban on cruel and unusual punishment precludes the execution of mentally retarded persons. In compliance with *Atkins*, the Nevada Legislature adopted a statutory provision to address claims of mental retardation involving defendants who, like Ybarra, were sentenced to

death before the decision in *Atkins*. NRS 175.554(5). Ybarra sought relief under that statute, asking the district court to set aside his death sentence on the ground that he is mentally retarded. In this appeal from the district court's order denying relief, we address two issues.

First, we consider whether the denial of Ybarra's motion to disqualify the post-conviction district court judge based on implied bias violated state and federal guarantees of due process. We conclude that it did not because neither the judge's prior legal representation of the victim's family on matters unrelated to the murder nor the case's notoriety in the judge's community would cause an objective person reasonably to question the judge's impartiality.

Second, we consider whether the district court erred in concluding that Ybarra had not demonstrated by a preponderance of the evidence that he was mentally retarded. NRS 174.098(7) defines "mentally retarded" as "significant subaverage general intellectual functioning which exists concurrently with deficits in adaptive behavior and manifested during the developmental period." As matters of first impression, we address the three components of the mental retardation definition and, in particular, hold that the "developmental period" referenced in the statute includes the period before a person reaches 18 years of age. Because Ybarra failed to produce sufficient evidence of subaverage intellectual functioning and adaptive behavior deficits before he reached 18 years of age, the district court did not err in concluding that Ybarra had not demonstrated that he was mentally retarded and denying the motion to strike the death penalty.

## FACTS

On the evening of September 28, 1979, 16-year-old Nancy Griffith and a girlfriend met 26-year-old Robert Ybarra, Jr., in Ely, Nevada. Ybarra drove the girls around town but eventually dropped off Griffith's girlfriend at her sister's home. Although the two girls arranged to meet later that evening, the girlfriend never saw Griffith again after leaving her with Ybarra. When Griffith was found the next day, she was barely alive. Ybarra had beaten and raped her, set her ablaze with gasoline, and left her to die in the desert outside of Ely. Suffering from burns that seared her respiratory passages and charred 80 percent of her body, Griffith died shortly thereafter.

A jury found Ybarra guilty of first-degree murder, first-degree kidnapping, battery with intent to commit sexual assault, and sexual assault. And after finding four circumstances aggravated the murder and no mitigating circumstances sufficient to outweigh them, the jury imposed death for the first-degree murder and consecutive terms of life in prison without the possibility of parole for the remaining offenses. We affirmed the judgment of conviction

and death sentence. *Ybarra v. State*, 100 Nev. 167, 679 P.2d 797 (1984).

Over the years, Ybarra filed three state post-conviction petitions, which were denied in the district court. This court upheld the district court decisions in all three instances. *Ybarra v. State*, 103 Nev. 8, 731 P.2d 353 (1987); *Ybarra v. Director*, Docket No. 19705 (Order Dismissing Appeal, June 29, 1989); *Ybarra v. Warden*, Docket No. 32762 (Order Dismissing Appeal, July 6, 1999).

Ybarra raised the issue of mental retardation in his fourth petition, which he filed on March 6, 2003. In that petition, Ybarra contended that he was incompetent to be executed due to his mental retardation. The district court dismissed the petition, concluding that it was procedurally barred. This court disagreed as to the mental-retardation claim and remanded that issue to the district court for appropriate proceedings under NRS 175.554(5). *Ybarra v. Warden*, Docket No. 43981 (Order Affirming in Part, Reversing in Part, and Remanding, November 28, 2005). On remand, Ybarra filed a motion under that statute. The district court conducted a two-day hearing on the motion at which Ybarra presented the testimony of two expert witnesses, the State presented the testimony of an expert witness, and the court considered exhibits totaling more than 3,000 pages. The district court determined that Ybarra had failed to meet his burden of proving mental retardation that began during the developmental period. Based on that failure, the district court denied the motion in a detailed 46-page written order. This appeal followed.

## DISCUSSION

### Judicial bias

The Honorable Steve Dobrescu presided over the post-conviction proceedings at issue in this appeal. Judge Dobrescu disclosed below that when he was an attorney in private practice, he represented Griffith's sister in an adoption proceeding in 1996 and prepared wills for Griffith's parents in 1998. Based primarily on that prior professional relationship, Ybarra filed a motion to disqualify Judge Dobrescu for bias. Another district court judge heard and denied the motion. *See* NRS 1.235(5). Ybarra challenges that decision, arguing that disqualification was warranted under state and federal constitutional due process guarantees and Nevada Code of Judicial Conduct (NCJC) Canon 3E. We disagree.

The NCJC ''provides substantive grounds for judicial disqualification.'' *PETA v. Bobby Berosini, Ltd.*, 111 Nev. 431, 435, 894 P.2d 337, 340 (1995), *overruled on other grounds by Towbin Dodge, LLC v. Dist. Ct.*, 121 Nev. 251, 112 P.3d 1063 (2005).

Two provisions are relevant here.[1] First, NCJC Canon 2A provides that "[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Commentary accompanying that provision explains that "[t]he test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." Second, NCJC Canon 3E provides that "[a] judge shall disqualify himself . . . in a proceeding in which the judge's impartiality might reasonably be questioned," although none of the specific grounds for disqualification enumerated in that Canon apply here. Both provisions address the importance of impartiality.

"[T]he test for whether a judge's impartiality might reasonably be questioned is objective," *PETA*, 111 Nev. at 436, 894 P.2d at 340, and presents "a question of law [such that] this court will exercise its independent judgment of the undisputed facts," *id.* at 437, 894 P.2d at 341. Because a judge is presumed to be impartial, "the burden is on the party asserting the challenge to establish sufficient factual grounds warranting disqualification." *Goldman v. Bryan*, 104 Nev. 644, 649, 764 P.2d 1296, 1299 (1988), *abrogated on other grounds by Halverson v. Hardcastle*, 123 Nev. 245, 266, 163 P.3d 428, 443 (2007); *see PETA*, 111 Nev. at 437, 894 P.2d at 341. Ultimately, we must decide "whether a reasonable person, knowing all the facts, would harbor reasonable doubts about [the judge's] impartiality." *PETA*, 111 Nev. at 438, 894 P.2d at 341; *see Suh v. Pierce*, 630 F.3d 685, 691-92 (7th Cir. 2011) (observing that due process requires fair trial in fair tribunal but that most judicial disqualification matters do not rise to constitutional level and that United States Supreme Court has never held that due process requires recusal based solely on appearance of bias).

The circumstances presented here, with a prior professional relationship between the trial judge and the victim's family, have not been addressed in many published decisions. An Illinois appellate court, however, has dealt with a similar situation. In *People v. Booker*, the defendant, who was charged with sexually assaulting his stepdaughter, argued on appeal that the trial judge should have been disqualified because the judge had represented the victim's natural father in divorce proceedings against the victim's mother around the time the assault occurred. 585 N.E.2d 1274, 1284 (Ill.

---

[1]The NCJC underwent significant revisions and renumbering effective January 19, 2010, after the proceedings at issue here. We apply the NCJC in effect at the relevant time.

App. Ct. 1992). Recognizing that recusal is required "whenever the judge's impartiality could reasonably be questioned," the appellate court could find no evidence in the record suggesting that the trial judge was biased against the defendant, *id.* at 1285, thus indicating that the prior relationship alone was not sufficient to question the judge's impartiality. *See also Suh*, 630 F.3d at 691-92 (rejecting claim of appearance of bias where trial judge had casual acquaintanceship with members of murder victim's family). *See generally Jacobson v. Manfredi*, 100 Nev. 226, 230, 679 P.2d 251, 254 (1984) (stating that "a judge, especially a judge in a small town, need not disqualify himself merely because he knows one of the parties").

The same is true here. Although Ybarra asserts that a reasonable person would have doubts about Judge Dobrescu's impartiality based on his prior legal representation of Griffith's family, there are not sufficient facts in the record to support such a conclusion. Nothing in the record suggests that Judge Dobrescu was biased against Ybarra as a result of the prior professional relationship. The prior professional relationship was wholly unrelated to the murder, which had occurred 17 to 19 years before the professional relationship, or the issues facing Judge Dobrescu in the postconviction proceedings, which commenced 5 to 7 years after the professional relationship. There is no evidence that Judge Dobrescu has any continuing duty or obligations to the Griffith family. Nor is there any evidence that Judge Dobrescu has a direct, personal interest in the outcome of Ybarra's case. Ybarra presents a speculative claim that is not supported by sufficient facts to warrant disqualification. *See Rippo v. State*, 113 Nev. 1239, 1248, 946 P.2d 1017, 1023 (1997) ("Disqualification must be based on facts, rather than mere speculation."). We therefore cannot conclude that the prior representation would cause an objective person reasonably to doubt Judge Dobrescu's impartiality.

To the extent Ybarra argues that the notoriety of his case requires heightened scrutiny of his disqualification motion, we again disagree. Following Ybarra's reasoning would require the disqualification of the local judges in every high-profile case tried in a community. Given the presumption that judges are impartial and the challenging party's burden of establishing sufficient factual grounds, not just speculation, to warrant disqualification, *id.*, we decline to ascertain bias merely based on the high-profile nature of a case. Because Ybarra articulated no facts causing doubt as to Judge Dobrescu's impartiality based on the high-profile nature of this case, we conclude that this claim lacks merit.[2]

---

[2]Ybarra argues that the disqualification issue presents an equal protection violation because "the degree of impartiality afforded a party is not protected by an equal standard for all judges throughout the state, but is relaxed when

Because we conclude that Ybarra's grounds for disqualification lack merit, no violation of his state and federal due process rights occurred by Judge Dobrescu's participation in the post-conviction proceedings. The disqualification motion was properly denied.

## Mental retardation

Ybarra argues that the district court failed to adequately consider evidence of his mental retardation and, as a result, erroneously denied his motion to strike the death penalty. We disagree.

### Definition of mental retardation

Although the United States Supreme Court has held that the execution of mentally retarded individuals violates the Eighth Amendment's prohibition against cruel and unusual punishment, *Atkins*, 536 U.S. at 321, the Court did not prescribe a definition of mental retardation or procedures for determining when an individual is mentally retarded. Instead, the Court left " 'to the State[s] the task of developing appropriate ways to enforce [this] constitutional restriction upon . . . execution[s],' " *id.* at 317 (first, third, and fourth alterations in original) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)). The Nevada Legislature accomplished that task with the passage of NRS 174.098, which sets forth the procedure for raising mental retardation in a capital case and defines "mentally retarded." The statute provides that upon motion by a defendant,[3] the district court must conduct an evidentiary hearing to determine whether the defendant is mentally retarded. NRS 174.098(1), (2); *see also* NRS 175.554(5). The defendant bears the burden of proving by a preponderance of the evidence that he is "mentally retarded," NRS 174.098(5)(b), which the Legislature defines as "significant subaverage general intellectual functioning which exists concurrently with deficits in adaptive behavior and manifested during the developmental pe-

___

the matter is pending in a small community, in which the threat to a judicial officer's impartiality is, as here, greater than in a large community." We conclude that Ybarra's claim lacks merit as he failed to demonstrate that he is a member of a protected class or suffered impermissible discrimination. *See Cairns v. Sheriff*, 89 Nev. 113, 115, 508 P.2d 1015, 1017 (1973) (explaining requirements of equal protection claim).

[3]The statutory scheme accounts for defendants who have not yet been tried and sentenced to death and those who were sentenced to death without a prior determination regarding mental retardation. Under NRS 174.098, a defendant facing a capital sentence may file a motion, not less than 10 days before the date set for trial, to declare that the defendant is mentally retarded. A defendant who has been sentenced to death without a prior determination regarding mental retardation under NRS 174.098 may file a motion under NRS 175.554(5) to set aside the death penalty on the ground that the defendant is mentally retarded. In both circumstances, the proceedings on the motion are governed by NRS 174.098(2)-(7). *See* NRS 174.098; NRS 175.554(5).

riod," NRS 174.098(7). This court has not yet had occasion to address the statutory definition of mentally retarded. We take this opportunity to do so.

The definition of "mentally retarded" in NRS 174.098(7) was taken from NRS 433.174, which was adopted in 1975 and defines "mental retardation" for purposes of NRS Title 39 (Mental Health). *See* Hearing on A.B. 15 Before the Assembly Comm. on Judiciary, 72d Leg. (Nev., Feb. 25, 2003). The statutory definition conforms to the clinical definitions espoused by two professional associations that are concerned with mental retardation—the American Association on Mental Retardation (AAMR)[4] and the American Psychiatric Association (APA).[5] In particular, the statutory definition and the two clinical definitions share three concepts: (1) significant limitations in intellectual functioning, (2) significant limitations in adaptive functioning, and (3) age of onset.[6] Given the similarities between the statutory definition and the clinical definitions of mental retardation, the AAMR and APA provide useful guidance in applying the definition set forth in NRS 174.098.

The first concept—significant limitations in intellectual functioning—has been measured in large part by intelligence (IQ) tests. Because "there is a measurement error of approximately 5 points in assessing IQ," which may vary depending on the particular in-

---

[4]In 2006, the AAMR changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD). At the time *Atkins* was decided and Ybarra sought relief in the district court, the organization was known as the AAMR. Therefore, we use the designation AAMR in this opinion.

[5]This focus on the AAMR's and APA's clinical definitions is not uncommon. As the Supreme Court observed in *Atkins*, the various statutory definitions of mentally retarded in existence at that time "are not identical, but generally conform to the clinical definitions" set out by the AAMR and APA. 536 U.S. at 317 n.22; *see also id.* at 318 ("[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.").

[6]The AAMR defines mental retardation as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." *Mental Retardation: Definition, Classification, and Systems of Support* 1 (10th ed. 2002). Similarly, the APA defines mental retardation based on the same three criteria:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skills areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

*Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000).

telligence test given, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000), the clinical definitions indicate that "individuals with IQs between 70 and 75" fall into the category of subaverage intellectual functioning, *id.* at 42. *See also State v. McManus*, 868 N.E.2d 778, 785 (Ind. 2007); *State v. Vela*, 777 N.W.2d 266, 294 (Neb. 2010); *Ex Parte Briseno*, 135 S.W.3d 1, 7 n.24 (Tex. Crim. App. 2004). Although the focus with this element of the definition often is on IQ scores, that is not to say that objective IQ testing is required to prove mental retardation. Other evidence may be used to demonstrate subaverage intellectual functioning, such as school and other records. *See McManus*, 868 N.E.2d at 787; *Com. v. Vandivner*, 962 A.2d 1170, 1187 (Pa. 2009); *see also Morris v. State*, No. CR-07-1997, 2010 WL 415245, at *10 (Ala. Crim. App. Feb. 5, 2010) (considering school records in determining whether defendant was mentally retarded). But the burden remains on the defendant to present evidence affirmatively establishing this element of mental retardation. *See* NRS 174.098(5)(b).

To be found mentally retarded, an individual with subaverage intellectual functioning must also meet the second element, showing significant deficits in adaptive behavior. As the APA explains, individuals " 'with IQs somewhat lower than 70' " would not be diagnosed as mentally retarded if there " ' 'are no significant deficits or impairment in adaptive functioning.' " *Stripling v. State*, 401 S.E.2d 500, 504 (Ga. 1991) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 37 (3d ed. 1980)); *Myers v. State*, 130 P.3d 262, 268 (Okla. Crim. App. 2005) (stating that IQ tests are not solely determinative of mental retardation issue). Thus, the interplay between intellectual functioning and adaptive behavior is critical to a mental retardation diagnosis. "Adaptive behavior" has been defined as the "collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives," and thus, "limitations on adaptive behavior are reflected by difficulties adjusting to ordinary demands made in daily life." *Com. v. Miller*, 888 A.2d 624, 630 (Pa. 2005); *see also In re Hawthorne*, 105 P.3d 552, 557 (Cal. 2005); *McManus*, 868 N.E.2d at 787 (noting that "Indiana's adaptive behavior prong most closely resembles the AAMR definition"); *Vela*, 777 N.W.2d at 294; *Briseno*, 135 S.W.3d at 7 n.25; *Diagnostic and Statistical Manual of Mental Disorders* 42 (4th ed. 2000) (explaining that "[a]daptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting").

The final element in finding mental retardation is the age of onset. NRS 174.098(7) refers to onset during the "developmental period." We must therefore delineate the boundaries of the "developmental period" referenced in the statute. To do so, we look to the purpose of the age-of-onset requirement, the clinical definitions of mental retardation, and other jurisdictions' definitions of mental retardation. The purpose behind the age-of-onset requirement is twofold. The requirement ensures "that the mental retardation developed during the developmental period, as opposed to forms of brain damage that occur later in life," and, in the criminal arena, it precludes defendants from feigning mental retardation once charged with a capital crime. Alexis Krulish Dowling, Comment, *Post-Atkins Problems With Enforcing the Supreme Court's Ban on Executing the Mentally Retarded*, 33 Seton Hall L. Rev. 773, 805 (2003); *see* Penny J. White, *Treated Differently in Life but Not in Death: The Execution of the Intellectually Disabled After Atkins v. Virginia*, 76 Tenn. L. Rev. 685, 707 (2009) (stating that "[t]he purpose of this [age] onset requirement is not to exclude some people with intellectual disabilities from the mental retardation category, but rather to differentiate between individuals with mental retardation and individuals with other mental deficits caused by injuries or diseases that occurred during adulthood"); Nita A. Farahany, *Cruel And Unequal Punishments*, 86 Wash. U. L. Rev. 859, 884 (2009) (noting that "[i]n medicine, age of onset helps a clinician to distinguish mental retardation from other mental disabilities"). The clinical definitions adopted by the AAMR and the APA focus on the age of 18 years, requiring that subaverage intellectual functioning and adaptive behavior deficits manifest themselves before that age. Most jurisdictions are in step with the AAMR and APA and have required, either by statute or caselaw that these intellectual and adaptive deficits must originate before 18 years of age.[7] *E.g.*, Ariz. Rev. Stat. Ann. § 13-753(K)(3) (2010); Ark. Code Ann. § 5-4-618(a)(1)(A) (2006); Cal. Penal Code § 1376(a) (West Supp. 2011); Conn. Gen. Stat. Ann. § 53a-46a(h) (2009); Conn. Gen. Stat. § 1-1g (2009) (defining mental retarda-

---

[7] A minority of three jurisdictions—Indiana, Maryland, and Utah—statutorily define mental retardation as the manifestation of significant subaverage intellectual functioning and substantial impairment of adaptive behavior before the age of 22 years. Ind. Code Ann. § 35-36-9-2 (LexisNexis 1998 & Supp. 2010); Md. Code Ann., Crim. Law § 2-202(b)(1)(ii) (LexisNexis 2002); Utah Code Ann. § 77-15a-102(2) (2008). Although one of Ybarra's experts explained that the developmental period may extend "sometimes to 25," we have found no other support for such an expansive view in other jurisdictions.

tion); Del. Code Ann. tit. 11, §§ 4209(d)(3)(a), 4209(d)(3)(d)(2) (2007); Fla. Stat. Ann. § 921.137(1) (West 2006 & Supp. 2011); Idaho Code Ann. § 19-2515A(1)(a) (2004 & Supp. 2010); 725 Ill. Comp. Stat. Ann. 5/114-15(d) (West 2006); La. Code Crim. Proc. Ann. art. 905.5.1(H)(1) (2008 & Supp. 2011); Kan. Stat. Ann. § 21-4623(e) (Supp. 2010); Kan. Stat. Ann. § 76-12b01(d) (1997); N.C. Gen. Stat. § 15A-2005(a)(1)(a) (2009); Okla. Stat. Ann. tit. 21, § 701.10b(B) (West 2002 & Supp. 2010); S.D. Codified Laws § 23A-27A-26.1 (2004); Tenn. Code Ann. § 39-13-203(a)(3) (2010); Va. Code Ann. § 19.2-264.3:1.1(A) (2008 & Supp. 2010); Wash. Rev. Code. Ann. § 10.95.030(2)(e) (West 2002 & Supp. 2011); *In re Brown*, 457 F.3d 392, 396 (5th Cir. 2006) (recognizing that Texas courts have adopted the AAMR definition of mental retardation providing that mental retardation must manifest before age of 18 years); *Chase v. State*, 873 So. 2d 1013, 1027-28 (Miss. 2004) (adopting AAMR and APA definition of mental retardation, including onset before age of 18 years); *Com. v. Miller*, 888 A.2d 624, 629-31, 630 n.7 (Pa. 2005) (same). A few jurisdictions, like Nevada, have statutes that refer more generally to the ''developmental period.'' Ala. Code § 15-24-2(3) (LexisNexis 1995 & Supp. 2010); Colo. Rev. Stat. § 18-1.3-1101(2) (2010); Ga. Code Ann. § 17-7-131(a)(3) (2008 & Supp. 2010); Ky. Rev. Stat. Ann. § 532.130(2) (LexisNexis 2008); S.C. Code Ann. § 16-3-20(C)(b)(10) (2003). Courts in two of those states have answered the same question that we face in this case—what is the ''developmental period''? Those courts have defined ''development period'' as the time before an individual reaches 18 years of age, consistent with the age of onset used in the clinical definitions and in a majority of jurisdictions. *Holladay v. Campbell*, 463 F. Supp. 2d 1324, 1341-42 (N.D. Ala. 2006); *Ex Parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002); *Stripling v. State*, 401 S.E.2d 500, 504 (Ga. 1991) (observing that Georgia's statutory definition of mental retardation is consistent with APA, which identifies developmental period as before age 18).

We conclude that the approach to the age-of-onset requirement taken by the AAMR and APA and the majority of jurisdictions—that a person suffered from mental retardation prior to the age of 18 years—best serves the purpose behind the requirement. Focusing on the period before a person reaches 18 years of age ensures that the person suffers from mental retardation rather than some other mental impairment that occurred later in life and that a criminal defendant cannot feign mental retardation to avoid a capital sentence. Considering the purpose behind the age-of-onset requirement, the guidance provided by the AAMR and APA, and the consensus among most jurisdictions, we conclude that the ''devel-

opmental period'' referenced in NRS 174.098(7) is the period before a person reaches 18 years of age. Accordingly, subaverage intellectual functioning and adaptive behavior deficits must originate before 18 years of age to meet the definition of mental retardation contemplated by NRS 174.098.[8]

With this understanding of the elements of mental retardation in mind, we turn to the district court's decision and Ybarra's challenges to it. To begin with, we must address the standard of review that applies when a district court's decision regarding a claim of mental retardation is reviewed on appeal. While some courts have reviewed such decisions for an abuse of discretion, *see Rondon v. State*, 711 N.E.2d 506 (Ind. 1999); *State v. White*, 885 N.E.2d 905 (Ohio 2008), or clear error, *see Com. v. Crawley*, 924 A.2d 612, 616 (Pa. 2007) (''[O]ur standard of review [for mental retardation determinations] is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous.''), others have treated it as a mixed question of fact and law, *see Walker v. Kelly*, 593 F.3d 319, 322-23 (4th Cir. 2010) (applying Virginia law to mental retardation determinations, appellate courts review district court's factual findings for clear error and legal conclusions de novo); *Cherry v. State*, 959 So. 2d 702, 712 (Fla. 2007) (noting that in reviewing mental health determinations, appellate courts ''employ[ ] the standard of whether competent, substantial evidence supported the [postconviction] court's determination'' and questions of law are reviewed de novo). In our view, the determination whether a capital defendant is mentally retarded is based on factual conclusions but requires distinctively legal analysis to determine whether the elements of mental retardation have been proven, and therefore, we will review such a determination as a mixed question of fact and law. *See Hernandez v. State*, 124 Nev. 639, 646, 188 P.3d 1126, 1131 (2008) (''We have noted that review of a district court's decision as a mixed question of law and fact is appropriate where the determination, although based on factual conclusions, requires distinctively legal analysis.''). Accordingly, we will give deference to the district court's factual findings so long as those findings are supported by substantial evidence and are not clearly erroneous, but we will review the legal consequences of those factual findings de novo. *See Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005) (applying mixed-question standard of review). Matters of credibility in this area remain, however, within the district court's discretion. *See Mann v.*

---

[8]The district court found that the developmental period was childhood to age 18 but nevertheless considered evidence of mental retardation between the ages of 18 and 25.

*State*, 118 Nev. 351, 356, 46 P.3d 1228, 1231 (2002) (observing that on remand for evidentiary hearing "the district court will be better able to judge credibility"). *See generally Mulder v. State*, 116 Nev. 1, 15, 992 P.2d 845, 853 (2000) ("The trier of fact determines the weight and credibility to give conflicting testimony."). For the reasons explained below, we conclude that Ybarra failed to show that the onset of any subaverage general intellectual functioning and adaptive behavior deficits occurred before he reached age 18. Accordingly, the district court did not err by denying the motion to strike the death penalty on this ground.

### Evidence concerning Ybarra's alleged mental retardation

The district court conducted a two-day evidentiary hearing vetting the issue of Ybarra's alleged mental retardation. Ybarra presented two expert witnesses—Dr. David Schmidt, a psychologist, and Dr. Mitchell Young, a psychiatrist. The State countered with an expert witness—Dr. Theodore Young, a neuropsychologist. The district court also considered more than 3,000 pages of exhibits, including school records, mental health and medical records, military records, prison records, and letters and other communications (primarily prison kites)[9] Ybarra authored during his incarceration.[10]

Ybarra was born on July 20, 1953, in West Sacramento, California, and is the oldest of five children. He attended school until the age of 16, when he transferred to an alternative school and ultimately obtained his adult education degree shortly before he turned 19. Ybarra has a lengthy history of drug and alcohol abuse beginning in his teenage years and extending into adulthood. He enlisted in the Marine Corps twice but was discharged for homosexual conduct and fraudulent enlistment. Ybarra also enlisted in the Army National Guard but was discharged due to a medical condition (asthma). The record shows that Ybarra has been diagnosed with an assortment of mental conditions, including delusions and hallucinations, organic personality disorder, depression, and bipolar disorder, to identify a few. When Ybarra was 25 he married, but the marriage lasted only a few months.

### Defense experts

The first defense expert, Dr. Schmidt, interviewed and tested Ybarra in October 2001 and January 2002 and considered a wide

---

[9]In its broadest use, "kite" is prison slang for a written communication. More narrowly, it is a written request for services or other assistance within the prison.

[10]On August 30, 2010, Ybarra filed a motion for remand to present additional evidence related to his mental retardation claim. We are not convinced that a remand is warranted on this basis. Accordingly, we deny the motion for remand.

range of information in forming his opinion that Ybarra is mentally retarded. During the evaluation, Dr. Schmidt administered the Wechsler Adult Intelligence Scale (3d edition) (WAIS-III) to Ybarra, who scored a full scale IQ of 60, which, Dr. Schmidt explained, placed Ybarra's actual IQ between 57-60, meaning that Ybarra's intellectual functioning fell within the mild range of mental retardation. As further support for this finding regarding Ybarra's limited intellectual functioning, Dr. Schmidt relied on Ybarra's mental health records, which included a psychiatrist's diagnosis during Ybarra's developmental years that he was intellectually challenged. Dr. Schmidt also pointed to a significant head injury sustained when Ybarra was about 9 years old, after which Ybarra suffered headaches and experienced abnormal electroencephalogram (EEG) test results. According to Dr. Schmidt, Ybarra's condition deteriorated into mental illness, which changed the course of his development, driving him into the range of mental retardation. He explained that other evidence supported his conclusions about Ybarra's limited intellectual functioning and adaptive skills, including that Ybarra displayed an inability to participate in sports, he had difficulty getting along with his school peers, and his performance in school deteriorated with him being transferred to an alternative school at age 16 when a school psychiatrist concluded that he would not benefit from any further schooling. Dr. Schmidt explained that Ybarra's difficulties after his head injury showed that he had limited adaptive functioning but that these problems were masked throughout his developmental period because friends and family assisted him in his care and provided a structured environment. As further evidence of Ybarra's limited adaptive skills as he grew older, Dr. Schmidt testified that Ybarra was unable to maintain steady employment, relying on friends and family for work because he was unable to secure work on his own; when he was employed he only held menial jobs; he was in and out of the military, which suggested that he could not maintain employment; he never lived independently of others; and he became lost easily. Dr. Schmidt opined that the IQ test he administered and the other evidence he considered demonstrated that Ybarra is mentally retarded.[11]

Ybarra's second expert, Dr. M. Young, also concluded that Ybarra is mentally retarded based on interviews with Ybarra and tests that he administered to Ybarra in 2007 and on his review of numerous records, including Ybarra's medical, mental health, school, and police records. Dr. M. Young administered the Street Survival Skills Questionnaire (SSSQ) to Ybarra. Although the SSSQ measures adaptive skills, Dr. M. Young's report indicates

---

[11]Dr. Schmidt testified that the developmental period that helps define mental retardation may include the period up to when an individual reaches 25 years of age.

that the raw score on the SSSQ can be converted to a standard score that is comparable to an IQ score. Ybarra scored a 79, which placed him in the borderline range of mental retardation. Although Dr. M. Young observed factors indicating malingering, he opined in his written evaluation that Ybarra met the criteria for mental retardation based on other sources of information, including the observations of other professionals who had interacted with Ybarra that when Ybarra is "confronted with an excess of information or affective stimuli, he becomes overwhelmed, agitated, avoidant, poorly communicative, and unable to cope with complex scenarios or problem solving," thus indicating to Dr. M. Young limited adaptive skills.

### The State's expert

Dr. T. Young, the State's mental health expert, disagreed with Dr. Schmidt's and Dr. M. Young's assessments of Ybarra's intellectual functioning. He interviewed Ybarra on September 27, 2007, and conducted a battery of tests, the results of which he described as "bizarre." Such "bizarre" results, according to Dr. T. Young, indicate that the client manipulated the evaluation and the test results could not be interpreted. Such was the case with Ybarra's test results. Dr. T. Young administered the Wechsler Abbreviated Scale of Intelligence (WASI) to Ybarra, who scored a full scale IQ score of 66, which was consistent with the score Ybarra received on the test administered by Dr. Schmidt and put Ybarra in the mild range of mental retardation. But Dr. T. Young testified that he had no confidence in the IQ score considering the uninterpretable results from the other tests that he administered to Ybarra. Because of the strange test results, Dr. T. Young administered the Test of Memory Malingering (TOMM) to Ybarra, who scored 30, indicating malingering. Based on the TOMM score, Dr. T. Young concluded that the data he collected from other tests was invalid, and therefore, he was unable to draw any conclusions about brain injury or mental retardation. Because Ybarra scored the same IQ on the test administered by Dr. Schmidt, Dr. T. Young questioned the validity of that IQ test. And, in fact, Dr. T. Young opined that there have been no valid IQ tests obtained from Ybarra that support mental retardation.

### Other evidence

No intelligence tests were administered to Ybarra during the developmental period. Ybarra was 27 years old when he took his first intelligence test—the WAIS, which Dr. Martin Gutride administered to him in 1981. Ybarra scored an IQ of 86, which is outside the range of mental retardation. When questioned about the discrepancy between Ybarra's IQ score on the 1981 test and his

significantly lower score on the test administered in October 2001 or January 2002,[12] Dr. Schmidt suggested that the 1981 test may have been scored incorrectly and observed that 26 years had passed between the two tests, with new tests having been developed and the norms for IQ tests having changed over time. He also suggested that the 1981 IQ score could be inflated by as much as 15 points[13] according to the Flynn effect, which refers to a body of work suggesting that IQ test scores show an upward drift over time until the test is re-normed. *See Pruitt v. State*, 903 N.E.2d 899, 910 n.7 (Ind. 2009) (noting that Flynn effect refers "to the gradual escalation of intelligence test scores over long periods of time"); *Smith v. State*, 245 P.3d 1233, 1237 n.6 (Okla. Crim. App. 2010). According to Dr. Schmidt's testimony that an IQ score of 70 to 75 indicates mild mental retardation, such an adjustment would put the 1981 score within the mild range of mental retardation.

Ybarra's school, mental health, and military records provided generalized assessments of his intellectual functioning that were not based on intelligence tests. Ybarra's seventh-grade teacher described him as a C to C+ student who had no learning problems and could have worked harder.[14] Mental health providers who evaluated Ybarra throughout his life for various reasons, most relating to his competency, described him as having average to below average intellectual functioning, with an estimated IQ between 70 and 80. One mental health evaluator (Dr. William O'Gorman, in 1980) indicated that he suspected that Ybarra was mentally retarded but could not establish to what degree. Military records described Ybarra's intellectual functioning as "dull normal," which Dr. Schmidt acknowledged is not within the range of mental retardation.

The evidence presented at the hearing included Ybarra's writings since his arrest and incarceration. The documents included dozens of prison kites that Ybarra prepared during his incarceration, which mostly dealt with dietary or medication concerns, and letters he wrote to friends, family members, and doctors. The defense experts suggested that the writings could not be used as evidence of Ybarra's intellectual functioning, as they opined that other inmates may have assisted Ybarra in drafting the documents. No other evidence was presented to support those opinions.

---

[12]Dr. Schmidt's report does not indicate the exact date when he administered the WAIS-III to Ybarra. His report indicates that he conducted Ybarra's evaluation on October 17 and 18, 2001, and January 10 and 11, 2002.

[13]Dr. Schmidt explained that a standard deviation is 15 points.

[14]Dr. Schmidt characterized the teacher's description of Ybarra as "the recollection of the teacher some 35 years later."

*District court's ruling*

The district court determined that the evidence simply did not support Ybarra's mental retardation claim, with much of the evidence undermining the testimony and credibility of the defense experts. The district court observed that while the defense experts were "well qualified and honorable," "the record is so full of evidence that contradicts their conclusions that the Court finds the bulk of their testimony to be of little weight." Identifying specific examples, the district court also concluded that Ybarra's experts "focused only on information that supported their conclusions with minimal consideration of evidence that undermined their opinions." Based on "a careful review of the record, an observation of the witnesses while testifying, and an observation of Robert Ybarra, Jr. throughout two (2) days of hearing," the district court concluded that Ybarra failed to demonstrate by a preponderance of the evidence that he is of subaverage intellectual functioning and has significant adaptive behavior deficits and that the onset of his alleged mental retardation occurred during the developmental period.

The district court concluded that Ybarra failed to present sufficient evidence to establish significant subaverage intellectual functioning that manifested during the developmental period. The court was persuaded in part by the fact that Ybarra was not tested for mental retardation before age 18, and despite contact with various school officials, no one suspected that he was mentally retarded. The district court observed that Ybarra obtained his adult education diploma and that military records described him as having "dull normal" or "borderline" intelligence, which the experts agreed was not in the range of mental retardation. The district court concluded that, at best, the evidence showed that Ybarra had below average intelligence prior to age 18.

The district court explained that even if it accepted Dr. Schmidt's testimony that the developmental period extends to age 25, noting that no jurisdiction has done so, Ybarra nevertheless failed to produce sufficient evidence of subaverage intellectual functioning that manifested before age 25, considering documentary evidence from other psychologists and psychiatrists describing Ybarra as having "borderline," normal, or low normal intelligence and IQ scores of 86 and 70 to 80. And the court rejected Dr. Schmidt's opinion regarding Ybarra's intellectual functioning as incredible, noting that with all the testing and observation of Ybarra from 1979 to 2002, Dr. Schmidt was the first to conclude that Ybarra was mentally retarded but his report contained a "bold-faced disclaimer" that Ybarra's IQ score "may underestimate his actual intelligence functioning" "due to the severe distress that

some portions of the . . . testing caused'' Ybarra. The district court also focused on Dr. Schmidt's admission that he gave no specific test for malingering, whereas the State's expert administered a test to detect malingering that produced a score that was ''off the scale,'' indicating that Ybarra was malingering. The district court also found that Dr. Schmidt's conclusions regarding the effects of Ybarra's brain damage and of his poor judgment and limited ability to solve problems, handle stress, and deal with his hallucinations did not ''withstand scrutiny in the context of Ybarra's real life actions and functioning.'' The district court further identified in great detail additional evidence of malingering and intellectual functioning that fell outside the range of mental retardation, including: (1) that Ybarra had a motive to fake performance on mental health tests; (2) reports by other mental health professionals that Ybarra was malingering or exaggerating symptoms of mental disorder and displaying psychotic behavior; (3) reports that Ybarra played cards, backgammon, scrabble, and other games while at a mental health facility (Lake's Crossing); (4) a report that Ybarra's hallucinations were not ''valid''; (5) suggestions and inferences by mental health professionals that Ybarra feigned incompetence; (6) hundreds of prison kites concerning medical issues showing a level of intelligence beyond a mildly mentally retarded individual;[15] and (7) medical progress notes suggesting that Ybarra feigned mental illness to remain in the prison mental health unit.

The district court also concluded that Ybarra failed to present sufficient evidence to establish significant adaptive behavior deficits that manifest during the developmental period. As to Ybarra's adaptive behavior before age 18, the district court concluded that minimal evidence supported any adaptive deficits. The court specifically found incredible Dr. Schmidt's conclusion that bullying by school peers and poor academic performance indicated an adaptive deficit, and instead found that Ybarra's academic and social problems could also be explained by his alcohol and drug abuse, as the other defense expert (Dr. M. Young) acknowledged. And the court pointed out that despite those problems, Ybarra managed to attend night school to secure his adult education diploma while maintaining employment. The district court also rebuffed Dr. Schmidt's opinion that Ybarra had adaptive deficits because he held only menial or minimum-wage jobs, noting that persons under 18 typically hold menial jobs and that Ybarra worked as a forklift driver for several years. The district court also found unpersuasive Dr. Schmidt's reliance on the lack of evidence that

---

[15]The district court rejected the defense experts' suggestions that Ybarra had assistance in preparing the dozens of prison kites, finding that ''[n]othing in the record supports a conclusion that Ybarra has had assistance in these writings, and the consistency in the topics and style of writing all support a finding that Ybarra did write his own kites without assistance.''

Ybarra lived independently, at least before the age of 18, as proof of adaptive deficits because most children do not live independently before the age of 18.

The district court was also unpersuaded by evidence Ybarra introduced concerning adaptive-behavior deficits exhibited between the ages 18 and 25 years. In particular, the district court found incredible Dr. Schmidt's conclusion that Ybarra was unable to hold a job, noting that Ybarra was employed for lengthy periods of time at salaries that exceeded minimum wage at the time. As to Ybarra's brief military service, the district court rejected Dr. Schmidt's opinion that this evidenced adaptive-behavior deficits as Ybarra was discharged for reasons that had nothing to do with his ability to adjust to the ordinary demands of daily life—he was discharged from the Marine Corps the first time for homosexuality and the second time for fraudulent enlistment, and was discharged from the Army National Guard for a medical condition. Further, the district court found that the record did not support Dr. Schmidt's conclusion that Ybarra was unable to live independently, pointing out that Ybarra moved to California, Oregon, Montana, and Nevada and secured living quarters and employment, and was married for a brief time.

Based on these findings and conclusions, the district court determined that Ybarra failed to demonstrate by a preponderance of the evidence that he suffered from significant subaverage intellectual functioning and adaptive behavior deficits that manifested during the developmental period. On appeal, Ybarra challenges specific aspects of the district court's decision. We address those challenges below.

### Intellectual functioning

Ybarra's disagreement with the district court's determination that he did not demonstrate subaverage intellectual functioning during the developmental period is twofold: the district court (1) erroneously focused on the 1981 IQ test to the exclusion of the IQ results Dr. Schmidt obtained and (2) erroneously relied on the tests administered by the State's expert because he used improper testing instruments, scoring, and administration techniques. We disagree, concluding that the district court's factual findings are supported by substantial evidence and that its legal conclusions are not erroneous.

### 1981 IQ test

Ybarra contends that the district court focused on the 1981 IQ test, disregarding the IQ test Dr. Schmidt administered, which resulted in a score (60) that is within the mild range of mental retardation. In this, Ybarra argues that the district court erroneously

concluded that the 1981 IQ test, which yielded a score of 86, was valid and that even when adjusted to account for the Flynn effect, the adjusted score was not within the range of mental retardation. According to Ybarra, when the 1981 score is adjusted consistent with Dr. Schmidt's testimony, the result is an adjusted score that is within the mild range of mental retardation.

As noted previously, the Flynn effect refers to a body of work suggesting that scores on a particular IQ test will drift upward over time until the test is re-normed. *See Pruitt v. State*, 903 N.E.2d 899, 910 n.7 (Ind. 2009) (noting that Flynn effect refers ''to the gradual escalation of intelligence test scores over long periods of time''). Whether IQ scores should be adjusted to account for the Flynn effect is a matter of great dispute in other jurisdictions. *See, e.g., Walker v. True*, 399 F.3d 315, 322-23 (4th Cir. 2005) (remanding for consideration of persuasiveness of Flynn effect where district court did not consider theory); *Green v. Johnson*, 515 F.3d 290, 300 n.2 (4th Cir. 2008) (noting that ''neither *Atkins* nor Virginia law appears to require expressly that [the Flynn effect and standard error of measurement] be accounted for in determining mental retardation status''); *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007) (noting that Flynn effect has not been accepted as scientifically valid in Fifth Circuit); *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1281 (N.D. Ala. 2009) (noting that even though recognized legal cutoff score for finding of significantly subaverage intellectual functioning is IQ of 70 or below, a court should not look at raw IQ score as precise measurement and must consider ''Flynn effect'' and standard error of measurement in determining whether IQ score falls within range containing scores less than 70); *U.S. v. Davis*, 611 F. Supp. 2d 472, 488 (D. Md. 2009) (concluding that ''Flynn effect'' evidence is relevant and persuasive and will consider Flynn-adjusted scores in evaluation of intellectual functioning); *Wiley v. Epps*, 668 F. Supp. 2d 848, 894-95 (N.D. Miss. 2009) (finding that regardless of whether '' 'Flynn effect' is considered as a precise mathematical formula in this case, it will take into consideration the obsolescence of test norms in weighing the evidence concerning Petitioner's intellectual functioning'' but expressly declining to rule whether Flynn effect must be applied or that failing to apply theory is unreasonable), *aff'd*, 625 F.3d 199 (5th Cir. 2010); *Maldonado v. Thaler*, 662 F. Supp. 2d 684, 713 n.27 (S.D. Tex. 2009) (declining to apply Flynn effect to results of petitioner's IQ scores), *aff'd*, 625 F.3d 229 (5th Cir. 2010); *In re Salazar*, 443 F.3d 430, 433 n.1 (5th Cir. 2006) (noting, without deciding whether Flynn effect is valid scientific theory, that petitioner's readjusted IQ score to account for score inflation was still above cutoff for mental retardation); *State v. Dunn*, 41 So. 3d 454, 470 n.16 (La. 2010) (noting that court has not expressly accepted Flynn effect as scientifically valid). And the district court indicated

that although the AAMR references the Flynn effect, it makes no recommendation to adjust IQ scores because of it.

We need not, however, take sides in the dispute over the Flynn effect at this time for three reasons. First, the district court did not disregard Dr. Schmidt's testimony regarding the Flynn effect. Rather, the court found the testimony incredible considering (a) other sources that either rejected the theory or did not demand adjustments in IQ scores to account for it; and (b) other evidence in the record supporting the validity of the 1981 IQ score, including evaluations from mental health professionals and Ybarra's military records reporting that he was of dull-normal to borderline intelligence. And although the district court was "not convinced [that] the scientific community is prepared to adjust the scores according to the Flynn effect," it nevertheless considered the Flynn effect and concluded that an adjustment for that effect reduced the 1981 IQ score to 78, which is outside the range of mental retardation. To the extent Ybarra challenges the district court's adjustment computation because it did not lower the IQ score by 15 points as suggested by Dr. Schmidt, we are not persuaded that the district court committed reversible error. In adjusting the IQ score to account for the Flynn effect, the district court used an adjustment rate of .31 per year "(for 26 years per Dr. Schmidt),"[16] which reduced Ybarra's IQ score from 86 to 78. Many courts have applied an adjustment rate of approximately .3 per year since the IQ test was re-normed. *See Witt v. State*, 938 N.E.2d 1193, 1200 (Ind. Ct. App. 2010) (citing *The American Association on Intellectual and Developmental Disabilities' User's Guide: Mental Retardation Definition, Classification and Systems of Supports* (10th ed. 2002)); *Bowling v. Com.*, 163 S.W.3d 361, 374 (Ky. 2005) (noting that Flynn effect suggests that "as time passes and IQ test norms grow older, the mean IQ score tested by the same norm will increase by approximately three points per decade"); *Dunn*, 41 So. 3d at 462 (citing James Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Psych., Pub. Pol., and L. 170, 176 (2006)). We conclude that the district court's adjustment calculation was not without foundation and does not indicate, as Ybarra suggests, that "the district court acted not as an impartial arbiter but as an advocate for the state" and was ill-informed.

Second, the district court did not rely solely on the 1981 IQ test to determine that Ybarra had not proven that he suffers from significant subaverage intellectual functioning. As explained above, the district court also looked to Ybarra's school and other records, his writings, and evidence that he was malingering. In fact, the district court expressly observed in its order that "[t]he record as a

---

[16]Dr. Schmidt testified that 26 to 27 years had elapsed between Ybarra's 1981 IQ test and the introduction of the new IQ test with changed norms.

whole (irrespective of the various IQ test scores) portrays Robert Ybarra as a person who does not have significant subaverage intellectual functioning now or during his developmental years.''

And third, we need not decide the relevance, if any, of the Flynn effect and the necessity of adjusting the 1981 IQ score because the 1981 IQ test, as with all of Ybarra's IQ tests, was administered well after he turned 18 years of age.[17] Therefore, this issue has little value in evaluating whether Ybarra presented sufficient evidence to establish mental retardation as defined in NRS 174.098(7).

### Tests administered by the State's expert

Ybarra also argues that the district court erroneously relied on the IQ test administered by the State's expert, Dr. T. Young, because that test was improperly administered and therefore invalid. Specifically, Ybarra argues that Dr. T. Young used a test that was designed for a quick assessment rather than ''making a legal determination'' of mental retardation and the test was improperly administered because Dr. T. Young acknowledged that prison guards were present during the test, contrary to testing protocol. In considering the IQ test administered by Dr. T. Young, the district court focused on its relationship to other evidence indicating that Ybarra was malingering. The court considered the test to be invalid because other evidence, including reports from mental health evaluations, prison medical records, letters and prison communications from Ybarra, and other tests that Dr. T. Young administered to Ybarra, indicated that Ybarra was malingering. It is not clear how the court's conclusion that the test was invalid for reasons other than those advanced by Ybarra helps Ybarra, particularly considering that the IQ score on that test, if it were valid, would have placed Ybarra within the mild range of mental retardation.[18] Therefore, we are unpersuaded that any consideration the district court gave to the IQ test administered by Dr. T. Young was improper or unfounded.

Ybarra further argues that Dr. T. Young improperly used and administered the TOMM to support his conclusion that Ybarra was malingering and the district court failed to consider evidence showing the inaccuracy of the TOMM test results, which included evidence that the TOMM should not be used on persons who are mentally retarded and that the test sometimes gives false positive

---

[17]This is true even had we accepted Dr. Schmidt's characterization of the developmental period as being up to age 25 years.

[18]We note in this respect that Dr. Schmidt pointed to the score on the IQ test administered by Dr. T. Young as corroborating the accuracy of the IQ test that he had administered approximately six years earlier.

results. We are not persuaded that the district court's consideration of the TOMM score requires reversal.

Clearly, the district court considered the TOMM results in its decision, observing that the TOMM score indicated malingering, but it is also clear that the district court considered a wealth of other evidence in determining that Ybarra was malingering and therefore had not proved significant subaverage intellectual functioning. Specifically, the district court found evidentiary support for malingering in the prison kites that Ybarra had written over the years, which "reveal[ed] an intelligence level which is clearly not that of a mildly retarded person," and the medical progress notes during his incarceration that "portray[ed] Ybarra as a man who knows how to manipulate and fake (or exaggerate) symptoms of mental illness to accomplish his goals." The district court also observed that comments by mental health professionals who evaluated Ybarra during his incarceration indicated that their testing of Ybarra revealed malingering. And the district court illustrated all of those conclusions with specific references to evidence in the record. The district court further observed Ybarra's "ability to manipulate health care professionals, attorneys, play scrabble, backgammon, racquetball and volleyball, and his ability to type, read medical literature, [and] write coherent meaningful letters and kites." Thus, there is evidence other than the TOMM score to support the district court's finding that Ybarra was malingering.

Moreover, as with the 1981 IQ score, the TOMM score is of little value in determining whether Ybarra met his burden of proving significant subaverage intellectual functioning, as the TOMM was administered well after Ybarra reached 18 years of age.

The district court's factual findings are supported by substantial evidence and support its conclusion that Ybarra did not show that he suffered from significant subaverage intellectual functioning that manifested during the developmental period.

### Adaptive behavior deficits

Ybarra claims two errors respecting the district court's ruling related to adaptive behavior deficits: the district court (1) disregarded evidence substantiating that element and (2) improperly relied on its own lay opinions that are contrary to the evidence. We disagree.

### Evidence substantiating adaptive behavior deficits

The defense experts opined that Ybarra showed adaptive behavior deficits in several areas of his life based on his victimization at school; his record of menial, minimum-wage, supervised jobs; the

lack of evidence that he had lived independently; the short duration of his military service; and other professionals' observations regarding Ybarra's behavior when confronted "with an excess of information or affective stimuli." But as the district court found, those considerations did little to demonstrate adaptive behavior deficits. And rather than disregarding that testimony, the district court found much of it to be incredible given other evidence in the record, all of which is carefully delineated in the district court's thorough written order. We conclude that the district court was in the best position to assess the credibility of the experts' testimony, and, although Ybarra disagrees with the district court's findings related to adaptive deficits, substantial evidence supports the district court's finding that Ybarra did not meet his burden of proving this element of mental retardation.

### Lay opinion

Ybarra contends that the district court erroneously relied on its own lay assumptions about adaptive functioning to the exclusion of evidence supporting a finding that he exhibited adaptive behavior deficits. The essence of Ybarra's argument is that the district court's preconceptions about what a mentally retarded person should or should not be able to do in terms of adaptive functioning led the district court to ignore uncontradicted evidence of particular adaptive deficits, including (1) Ybarra's inability to navigate his hometown; (2) his holding only menial jobs; (3) his problems dealing with others while in school; (4) his lack of independent living as evidenced by his marriage; (5) his reliance on another inmate to litigate a civil rights action; and (6) a school psychiatrist's (Dr. William Asher) conclusion that at age 15, Ybarra had reached his potential in school given his intellectual and emotional capabilities. Ybarra further complains that the district court placed great emphasis on evidence indicative of malingering in the absence of such evidence during his childhood or incarceration and ignored evidence showing that malingering is not inconsistent with a diagnosis of mental retardation. We disagree with Ybarra's assessment of the district court's findings and conclusions in this regard.

What the record shows is that the district court was faced with conflicting evidence concerning Ybarra's alleged adaptive behavior deficits. After listening to two days of expert testimony and considering approximately 3,000 pages of documents, the district court found the testimony of Ybarra's experts to be incredible considering the record as a whole. We do not perceive the district court's conclusions about the evidence to be improper lay opinion. Rather, the district court considered the evidence, making reasonable inferences from it, and ultimately concluded that Ybarra failed to show adaptive behavior deficits considering his alcohol

and drug abuse during his youth, his work record, military service, ability to live independently and travel, and written communications in prison.[19]

As to Ybarra's suggestion that the district court's reliance on evidence of malingering was misplaced, we disagree. The district court's finding that Ybarra had not met his burden of proving adaptive behavior deficits during the developmental period was not based on evidence of malingering. And while malingering played a role in the district court's finding regarding adaptive behavior deficits between the ages of 18 and 25, it considered other evidence in rejecting Ybarra's claim of adaptive behavior deficits during that time.[20] Rather, the bulk of the district court's discussion of malingering related to the intellectual functioning element of mental retardation. The district court expressly acknowledged that malingering does not exclude the possibility of mental retardation but that the record in this case supported a conclusion that Ybarra was malingering, and, in addition to other evidence related to intellectual functioning, he failed to prove that he had significant subaverage intellectual functioning. In determining that Ybarra was malingering, the district court identified specific evidence in the record where mental health providers who had evaluated Ybarra during his incarceration reported evidence of malingering. We conclude that any consideration the district court gave to malingering was supported by substantial evidence. Therefore, we reject Ybarra's contention that the record lacked evidence of malingering.

The district court's factual findings are supported by substantial evidence and support its conclusion that Ybarra did not meet his burden of proving adaptive behavior deficits that manifested during the developmental period. Because he failed to meet his burden in this regard, the district court did not err in concluding that he did not prove this element of mental retardation.

### CONCLUSION

Because Ybarra failed to meet his burden of demonstrating bias based on Judge Dobrescu's prior professional relationship with the murder victim's family or the notoriety of his case, his disqualification motion was unsupportable and properly denied. As to

---

[19]While the district court acknowledged that a fellow inmate assisted Ybarra with a federal lawsuit, which could support Dr. Schmidt's opinion that mentally retarded individuals often seek assistance from others in preparing written communications, the district court observed that Ybarra authored hundreds of coherent and concise prison kites and letters and that "the consistency in the topics and style of writing all support a finding that Ybarra did write his own kites without assistance."

[20]Although the district court considered evidence of adaptive behavior deficits from Ybarra's childhood to age 18 and age 18 to 25, the developmental period as we have defined it makes evidence related to the former primarily relevant.

Ybarra's mental retardation claim, we conclude that he failed to prove by a preponderance of the evidence that he suffered from significant subaverage intellectual functioning and adaptive behavior deficits during the developmental period, which extends to 18 years of age. Consequently, he failed to show that he is mentally retarded as provided in NRS 174.098(7). We therefore affirm the district court's order denying Ybarra's motion to strike the death penalty.

DOUGLAS, C.J., and CHERRY, SAITTA, GIBBONS, PICKERING, and HARDESTY, JJ., concur.